**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Fred PRICE and William H. Pierce, Defendants–Appellants.**

Nos. 93–3691, 93–3854.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1995.

Decided April 28, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied June 5, 1995.

John W. Vaudreuil, Asst. U.S. Atty., Steven O'Connor (argued), Office of U.S. Atty., Madison, WI, for U.S.

Stephen J. Meyer (argued), Madison, WI, for Fred Price.

Yolanda M. Springfield (argued), Stanley V. Woodard, Madison, WI, for William Pierce.

Before RIPPLE, MANION, and ROVNER, Circuit Judges.

MANION, Circuit Judge.

William Pierce and Fred Price were both charged with conspiring to possess crack cocaine and possession with intent to distribute. The drugs were found after Pierce had consented to a search of a car he was driving

and in which Price was a passenger. Both defendants filed pretrial motions to suppress the crack cocaine evidence, claiming that Pierce did not voluntarily consent to the search of the car. The magistrate recommended, and the district court agreed, that both motions should be denied. Price entered a conditional plea under Fed.R.Crim.P. 11(a)(2), reserving the right to appeal the denial of his motion; Pierce pleaded not guilty and proceeded to trial where a jury convicted him on both counts in the indictment. Both defendants filed separate appeals challenging the district court's denial of their motions to suppress. Price also challenges the district court's decision to increase his base offense level under U.S.S.G. § 2D1.1(b)(1) for possessing a weapon during the commission of a drug offense. For the reasons that follow, we affirm the district court's denial of the defendants' motions to suppress, and affirm the district court's determination to increase Price's base offense level under § 2D1.1(b)(1).

## I.

During the evening of March 30, 1993, Trooper Lawrence Brown of the Wisconsin State Patrol was on duty patrolling Interstate 90 near Baldwin, Wisconsin. Brown's vehicle was equipped with a video camera which was set up to receive transmissions from a body microphone attached to Brown. A considerable portion of the evidence necessary to the resolution of this appeal comes from the video obtained from Brown's carmounted video camera.

That evening, Brown stopped a northbound automobile for going 78 in a 65 m.p.h. zone. Inside the vehicle were co-defendants William Pierce and Fred Price, along with another passenger, James Walker. Pierce was the driver; Price was a passenger in the front seat, while Walker was a passenger in the back. Brown approached the car and asked Pierce for his license. Brown also asked the occupants where they were from. Pierce replied that they had come from Chicago. Brown asked Pierce to step out of the car and stand in front of his patrol car. Out of the hearing range of the two passengers, Brown asked Pierce how long he and his

passengers had been in Chicago. Pierce replied seven days. Brown left Pierce standing in front of his patrol car while he went back to talk to the passengers in Pierce's car. Brown asked the two passengers how long they had been in Chicago. "One day," they replied. After asking a few more questions, Brown left the car and came back to Pierce whom he told to return to his car while Brown obtained further information from dispatch.

During the conversations, Brown became suspicious that he had what is known in Wisconsin police jargon as a "Badger stop," that is, a potential drug bust. Brown based his suspicions on the fact that the passengers in the car appeared nervous and had given him contradictory answers concerning how long they had been in Chicago. Brown radioed dispatch for backup officers. Brown learned from dispatch that Pierce's license was suspended because of unpaid fines. After the requested backup arrived, Brown wrote out citations to Pierce for driving with a suspended license and for speeding. Brown also filled out a standardized consent-to-search form in the event he obtained Pierce's consent to search the car. Brown told the backup officers about his suspicions, and that he was going to issue the two citations to Pierce and "go from there."

Brown approached Pierce's car from the passenger side. Brown informed Pierce that his license was suspended and asked him to step out of the car so that he could explain the citations to him. Pierce again stepped out of his car and accompanied Brown to his patrol vehicle where he stood directly in the video camera's line of sight. Once there, Brown explained the two citations to Pierce. After some more questions, Brown told Pierce that he was free to go but that someone else would have to drive. Pierce stated that Walker could drive. Brown said that was okay but that he would have to wait to hear from dispatch, apparently to verify that Walker possessed a valid driver's license.

At this point, Brown asked Pierce if there were any guns or drugs in the car. Pierce said no. Brown then asked Pierce "Do you mind if I take a look?" to which Pierce quickly replied "Sure." Brown next asked

Pierce if he would be willing to sign a written consent form. Pierce apparently believed that Brown was asking him if he wanted to sign a written statement that there were no drugs or guns in the car, because he replied "Written consent? ... Saying I don't have drugs there?" Brown did not catch what Pierce was saying and said "Right." Pierce started to reach for a pen to sign the written consent form but then appeared hesitant. Brown told Pierce that he did not have to sign the form because he had already consented orally to Brown's request to search. Pierce asked Brown why he wanted to search the car. Brown replied that he had his suspicions and asked Pierce if he could pat him down. Pierce said nothing in response to this last question, but raised his arms until they were almost horizontal to the ground. Brown patted Pierce down and then asked him to have a seat in Brown's patrol car. Pierce raised no verbal objections nor made any physical gestures indicating that he objected to Brown's search of the car. Brown next approached Pierce's vehicle and asked the passengers to step out while Brown and other backup officers searched the car. The officers discovered a pound of crack cocaine in the car. In the trunk, near the left wheel well, the officers found an unloaded .44 handgun wrapped in paper towels.

Pierce and Price were both charged with one count of conspiring to distribute cocaine and possessing the same with intent to distribute. Pierce and Price both filed motions to suppress the evidence seized from the vehicle, claiming that Pierce never consented to the search. The district court referred these motions to a magistrate. The magistrate conducted an evidentiary hearing at which he reviewed the video of the incident, and heard live testimony from Brown and two other officers who participated in the search. The magistrate concluded that Pierce had voluntarily consented to the search and recommended that both defendants' motions be denied. Defendants filed objections to the magistrate's report. On review, the district court accepted the magistrate's report and recommendations and denied both motions.

Following this ruling, Price entered a conditional plea to the single distribution count under Fed.R.Crim.P. 11(a)(2), reserving the right to appeal the denial of his motion to suppress. The court dismissed the conspiracy count pursuant to Price's plea. Pierce went to trial where he was convicted on both counts. Both defendants filed separate briefs in which they each challenge the district court's denial of their motions to suppress.

## II.

### A. Consent to Search

 Pierce and Price both object to the district court's determination that Pierce voluntarily consented to the warrantless search. A warrantless search conducted pursuant to a valid consent is permissible under the Fourth Amendment. *Schneckcloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Whether a consent to search is voluntary, or the product of duress or coercion, is a question of fact to be determined from the totality of the circumstances. *Id.* at 227, 93 S.Ct. at 2047–48; *see also United States v. Rice,* 995 F.2d 719, 723 (7th Cir.1993). Because it is a question of fact, a finding of voluntariness will not be reversed absent clear error. *Rice,* 995 F.2d at 724.

 As a preliminary matter, we are at a loss to understand why the government did not contest Price's standing to challenge the voluntariness of Pierce's consent. In attacking the voluntariness of Pierce's consent, Price is attempting to suppress evidence gained as a consequence of an alleged violation of someone else's (Pierce's) Fourth Amendment rights. Yet we know from *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), that the rights guaranteed by the Fourth Amendment are personal, and may not be asserted vicariously. Rather, they must be championed by the one whose rights were infringed by the government's conduct. To the extent this appeal presents a legitimate challenge to Pierce's consent (on which we shall say more), that challenge belongs to Pierce. As the provider and driver of the car he had a reasonable expectation of privacy in it. This cannot be

said of Price, who was a mere passenger going along for the ride. But the government never raised this argument below, but rather treated Pierce and Price the same. Because *Rakas'* principle of "standing" is rooted in the substantive law of the Fourth Amendment and not Article III, *see Rakas,* 439 U.S. at 138–39, 99 S.Ct. at 427–28, the government may waive these types of standing objections, which is exactly what happened here. Therefore, we move on to address the merits of the Fourth Amendment claim raised by both defendants.

 The defendants' main challenge[1] is not so much whether Pierce's consent was "voluntary," but whether he "consented" at all. Defendants submit that Pierce's response "Sure" to Brown's question "Do you mind if I take a look?" should be interpreted as "Sure, *I mind.*" Perhaps in the abstract one could say that given the phrasing of Brown's question,[2] Pierce's response to it is ambiguous and thus capable of being interpreted as either "Go ahead" or "No way." But our review of the district court's finding of consent is not in the abstract. Rather, it is based on the clear error standard, *see Davis v. United States,* 328 U.S. 582, 593, 66 S.Ct. 1256, 1261, 90 L.Ed. 1453 (1946), which means that we will not overturn the district court unless after reviewing the entire record we are "left with a definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). No such mistake occurred here. The only conclusion to be drawn from the totality of the evidence is that Pierce's immediate response "Sure" meant, "Sure, go ahead." The crucial fact is Pierce's failure to protest upon learning that Brown understood his response as a consent to the search. Had Pierce not agreed to the search, now was the time to make that clear. Yet when confronted with Brown's understanding of his response, Pierce offered no objection at all; instead, he submitted to a pat-down search and took a seat in Brown's patrol car in order to get out of the rain. Given these circumstances it was not clear error for the district court to find that Pierce's response "Sure" meant that he agreed to the search.

The defendants counter that the events following Pierce's response to Brown's request to search the car undermine the conclusion that Pierce truly consented. In support, the defendants direct us to that portion of the video tape following Pierce's initial oral consent (which we include for context's sake):

Brown: Okay. Do you have any guns or drugs in that car?

Pierce: No (shaking his head)

Brown: Do you mind if I take a look?

Pierce: Sure (no head movement)

Brown: Would you be willing to sign a written consent form?

Pierce: Written consent?

Brown: A consent form—

Pierce: Saying I don't have drugs there—

Brown: [interrupting] right.

Pierce: Yes.

Brown: Okay.

The video tape next shows that Brown raised his clipboard, which had attached to it a standardized consent form, and presented it to Pierce. Pierce reached toward the pen on the clipboard asking:

Pierce: —well, what ... ?

Brown: You don't have to sign it.

Pierce then withdrew his hand from the clipboard and Brown continued:

Brown: Y'know, it's totally up to you. I just—I asked and you told me I could go ahead and take a look, if you don't want to sign the form that's fine.

*O'Hare Truck Serv. v. City of Northlake,* 47 F.3d 883, 886 n. 2 (7th Cir.1995).

---

**1.** In her brief, Pierce's appellate counsel raised a series of belated arguments directed at the reasonableness of Brown's initial stop of Pierce's car, and the legality of Brown's further detention after he had completed his investigation into Pierce's traffic offense. Pierce's counsel did not present these arguments in the briefs before the magistrate or in the objections to the magistrate's report filed with the district court. Accordingly, these arguments are waived. *See*

**2.** The defendants contend that Brown's question was an intentional trap. While perhaps the phrasing was unartful, we cannot agree with the defendants that the question or its delivery rose to the level of "trickery" or "subterfuge."

Pierce: Well, why ... ?

Brown: Well, I'm just kind of suspicious, there's a lot of things going on in that car.

Defendants insist that Pierce's reluctance to sign the consent form is evidence of his lingering confusion over Brown's unartfully phrased request to search which in turn casts doubt upon the meaning of his initial oral consent.

We cannot accept this view of Pierce's hesitancy to sign the consent form. Pierce's apparent confusion over the written consent form had nothing to do with his prior oral consent. When initially presented with the form, Pierce did not understand Brown to be requesting written confirmation of his prior consent. Rather, as indicated by Pierce's statements above, he believed Brown was asking him to sign a written statement that there were no drugs or guns in the car. Brown did not listen carefully to what Pierce was saying and therefore confirmed Pierce's misunderstanding of the nature of the consent form. Pierce did appear dismayed upon later learning that Brown intended to search the car whether or not he signed the form. But contrary to the defendants' view of this reaction, we don't read Pierce's dismay as evidence of his continuing confusion over Brown's request to search; rather, we think that Pierce's reactions, taken in context, simply demonstrate his disappointment upon learning that agreeing to sign the form would not forestall the search.

In a related argument, Price informs us that under Wisconsin State Patrol Procedure it was Brown's duty to clear up any confusion Pierce may have had. His failure to do so, Price says, further demonstrates that this consent search violated the Fourth Amendment, citing *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), and *Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

■ However, this contention is beside the point given our conclusion that Pierce's confusion had nothing to do with the validity of his prior consent. Moreover, this argument is wrong on the merits. *Sitz* involved a Fourth Amendment challenge to Michigan's use of highway sobriety checkpoints. To the extent the Court inquired into Michigan's procedures, it was to ensure that there were in place guidelines to limit the discretion of the officers conducting the checkpoint stops, an important factor in assessing the reasonableness of such temporary seizures. *See Sitz,* 496 U.S. at 452–53, 110 S.Ct. at 2486–87. Similarly, *Wells* involved a challenge to an inventory search of an impounded car, the reasonableness of which is also evaluated by the existence of a policy or practice governing inventory searches, thus curtailing the individual officer's ability to transform an inventory search into a general means of discovering incriminating evidence. *See Wells,* 495 U.S. at 3–4, 110 S.Ct. at 1634–35. However, there is nothing in the Court's consent-to-search jurisprudence directing us to determine either the existence of or compliance with any underlying state law in assessing the validity of a defendant's consent to a search. Seen in this light, Price is essentially requesting us to strike down Pierce's consent on the basis that Brown did not comply with state law. This does not state a claim under the Fourth Amendment. *See Gordon v. Degelmann,* 29 F.3d 295, 300–01 (7th Cir.1994).

■ Finally, the defendants point to Pierce's lack of knowledge concerning his right to refuse consent as a basis to reverse the district court. Defendants assert that a person's knowledge of his right to refuse is "the most significant factor" in determining whether a defendant voluntarily consented to a warrantless search. However, this argument has already been rejected by *Schneckcloth,* in which the Court held that "proof of knowledge of a right to refuse [is] [not] the *sine qua non* of an effective consent to a search." *Schneckcloth,* 412 U.S. at 234, 93 S.Ct. at 2051 (footnote omitted).

Having considered the defendants' arguments and finding them to be without merit, we affirm the district court's finding that Pierce consented to the warrantless search.

*B. Use of a Firearm: U.S.S.G. § 2D1.1(b)(1)*

Price challenges the district court's determination that he possessed the .44 handgun

for purposes of applying the two-level increase under § 2D1.1(b)(1). He concedes that in light of our intervening decision in *United States v. Mumford*, 25 F.3d 461 (7th Cir.1994), § 2D1.1(b)(1) is not limited to those instances where the firearm was possessed during the offense of conviction. Rather, it applies "where the defendant is accountable for the possession of a weapon by a co-conspirator during drug trafficking conduct relevant to the offense of conviction, of which the defendant was charged but not convicted, even where the weapon was not present during the offense of conviction." *Id.* at 468 (footnote omitted). Price argues instead that the facts in *Mumford* which gave rise to a finding of co-conspirator liability are not present in this case. Price argues that a finding in *Mumford* that the defendant was liable for his co-conspirator's possession of a weapon was warranted because the record demonstrated that the co-conspirator brandished and shot the gun in the presence of the defendant while they were en route to a drug deal. Here, Price argues, there is nothing in the record indicating that the gun was ever retrieved from the trunk of Pierce's car, let alone brandished or discharged in Price's presence.

We will review Price's challenges to the district court's factual findings under the clear error standard, which is to say that we will not reverse those findings unless left with a definite and firm conviction that the court made a clear mistake. *See Mumford*, 25 F.3d at 465.

We do not agree with Price's understanding of *Mumford*. *Mumford* did not base its determination of co-conspirator liability solely on the fact that the co-conspirator brandished and shot the weapon in the defendant's presence. Rather, it was sufficient in that case that the defendant was aware of the co-conspirator's possession of the weapon during the drug offenses in which both were involved. *See Mumford*, 25 F.3d at 469. This is so because the presence of firearms can provide an additional sense of security which in turn can facilitate the purchase and protection of drugs, as well as increase the danger of violence that all too often attends such activities. *Id.* at 469.

Here the record demonstrates that Price knew that Pierce had brought along a weapon. Price testified at Pierce's trial that Pierce told him during their trip that there was a gun in the trunk of the car. According to *Mumford*, Pierce's possession of the gun, of which Price was aware and which was part of the same course of conduct as Price's offense of conviction, was properly imputed to Price for purposes of applying the two-level enhancement of § 2D1.1(b)(1). Moreover, Price has not urged, nor could we conclude, that this is a situation in which it is "clearly improbable that the weapon was unconnected with the offense." Application Note 3 to U.S.S.G. § 2D1.1(b)(1). Therefore, the district court's finding that Price possessed the gun for purposes of the § 2D1.1(b)(1) enhancement was not clearly erroneous.

## III.

For the foregoing reasons the district court's denial of the defendants' motions to suppress is AFFIRMED. Also, the court's determination to enhance Price's base offense level under § 2D1.1(b)(1) for use of a firearm is AFFIRMED.