(No. 90096.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SAMUEL ANTHONY, Appellant.

*Opinion filed December 6, 2001.*

GARMAN, J., took no part.
THOMAS, J., dissenting.

Daniel D. Yuhas, Deputy Defender, and Jenifer L. Johnson, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, and John Schmidt, State's Attorney, both of Springfield (Joel D. Bertocchi, Solicitor General, and William L. Browers and Kendall R. Mills, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FITZGERALD delivered the opinion of the court:

The defendant, Samuel Anthony, was charged with unlawful possession of a controlled substance after Springfield police officers found a rock of cocaine on his person. The defendant filed a motion to suppress the cocaine, charging that the warrantless search and seizure conducted by the police was unconstitutional. The circuit court of Sangamon County granted the defendant's suppression motion, and the State appealed. The appellate

court reversed the trial court (No. 4—99—0708 (unpublished order under Supreme Court Rule 23)), and the defendant appealed.

The central issue in this case is whether the defendant's nonverbal conduct constituted voluntary consent to search his person. We reverse the appellate court, affirm the trial court, and remand.

## BACKGROUND

At the hearing on the defendant's motion to suppress, Springfield police officer Jeff Barr was the sole witness. On direct examination by the State, Officer Barr testified that in 1999 he worked on the community policing program in Springfield's Enos Park neighborhood. Under this program, an officer who normally works in that neighborhood would be assigned to patrol the area on foot. According to Officer Barr, the purpose of this program was "to make contact with the citizens, address any problems, mostly just to be seen. Walk and talk is basically how it was set up." Officer Barr stated that community policing program officers would randomly contact people outside the parameters of criminal investigations—"people on their porches, people walking on the street, people in alleys; just basically to get to know the community and to let the community get to know [the police]." In this way, officers "get to know who is in the neighborhood, where the problem areas are. That way it is more so the citizens get to know faces and not just the uniform."

At approximately 7:30 p.m. on June 11, 1999, Officer Barr and Officer Jim Stapleton were on routine walking patrol. Officer Barr testified, "At that time, I saw a black male [the defendant] exit the residence at 922 North Fourth, come out the front door—I should state that it was someone that I didn't know who lived in there at the time. There was only one resident who lived in the apartment complex there and that was a white female." The

defendant saw the police officers, turned away, and started walking down an alley adjacent to the building. Officer Barr, standing 50 feet away, called to the defendant, "Excuse me, sir. Can I talk to you for a minute?" The defendant turned around and stood in the middle of the alley for approximately 30 seconds, while Officer Barr and Officer Stapleton approached.

Officer Barr testified that he introduced himself as a Springfield police officer and "just asked what he was doing in the area and who he knew at the apartment complex that he was coming out of. *** He told me that he was there visiting a female by the name of [R]obbi." Officer Barr did not physically or verbally seize the defendant, and he did not threaten the defendant with arrest. Still, the defendant was nervous; his hands were shaking, and his voice was stuttering. Officer Barr became concerned when the defendant repeatedly reached his hands into his pants pockets and pulled them out: "So, I just asked him if he could please keep his hands out of his pocket while I was talking to him and that was for my safety and for my partner's safety." The defendant cooperated with this request, and Officer Barr then asked "if he had anything on him that he shouldn't have, anything like guns, drugs, knives, anything that could hurt me or my partner." The defendant answered "no."

Officer Barr then asked the defendant if he would consent to a search of his person. Officer Barr conceded that the defendant did not give verbal consent. Instead, Officer Barr stated, "He spread his legs apart and put his hands on top of his head; assumed the position I guess is the best way to describe it." Officer Barr construed the defendant's actions as nonverbal consent. Officer Barr never applied any physical force or made any physical contact with the defendant before searching him. Officer Barr never threatened the defendant or drew his weapon.

The search revealed that the defendant possessed a rock of cocaine.

During cross-examination by defense counsel, Officer Barr acknowledged that he knew a white female was living at 922 North Fourth Street. He also acknowledged that the defendant did not try to flee the officers and did not appear intoxicated or under the influence of drugs. Officer Barr testified that while he spoke with the defendant, Officer Stapleton walked 25 feet away to speak with a woman who had emerged from the apartment complex. Officer Barr never saw the defendant engage in any criminal activity and never had any prior contact with him.

The trial court granted the defendant's motion to suppress, stating, "Maybe in Russia they can do that but not here." The court elaborated:

"It is the opinion—my opinion that before you can stop anybody, you have—there has to be a suspicion and you have to be able to articulate facts that create a suspicion that they have committed a crime or are committing a crime or a crime is about to be committed.

There is nothing here. A man is walking along the street or the sidewalk. I don't think a police officer has right to do anything to that person. There is nothing here to indicate this man was doing anything wrong, period. So, that's why, and once the stop is not justified, everything else after that has to be thrown out; statements, evidence, anything."

The State appealed, and the appellate court reversed the trial court's ruling. The court found that Officers Barr and Stapleton did not conduct an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and instead concluded:

"the encounter falls under the community caretaking function and was not required to be justified by reasonable suspicion or criminal activity.

* * *

Here, Barr and Stapleton were clearly working in a com-

munity caretaking capacity when they approached defendant and questioned him about his business in Enos Park. It was precisely their job to stop and talk to the people of Enos Park so that the officers and Enos Park residents could familiarize themselves with each other. The officers did not know defendant and were attempting to get to know him as part of their duty."

Although the trial court did not reach the consent issue, the appellate court further held that the search of the defendant's person was legal: "Immediately upon Barr's request, defendant spread his legs and put his hands on top of his head. Defendant never protested during Barr's search or otherwise objected to the search. By these actions, defendant gave his consent to Barr for the search." No. 4—99—0708 (unpublished order under Supreme Court Rule 23).

We granted the defendant's petition for leave to appeal (177 Ill. 2d R. 315(a)).

## ANALYSIS

Initially, we note that the defendant contends that he was denied due process when he was not appointed counsel on the State's appeal. The State concedes this error, but asserts that this issue is moot. We agree with the State. The defendant is currently represented by counsel before this court, and he may present his arguments against the State here. We could not grant any relief that the defendant has not already received. See *Richardson v. Rock Island County Officers Electoral Board*, 179 Ill. 2d 252, 256 (1997). However, we strongly advise both the appellate court and the trial court to protect vigilantly the right to counsel for indigent defendants in State appeals. *Cf.* 145 Ill. 2d R. 605.

Before proceeding to the merits of the defendant's appeal, we must address the proper standard of review. Generally, when a motion to suppress evidence involves factual determinations or credibility assessments, we will reverse the trial court's ruling only if it is manifestly er-

roneous. *People v. Buss*, 187 Ill. 2d 144, 204 (1999). *De novo* review, however, is appropriate when neither the facts nor the credibility of witnesses is disputed. *People v. Sims*, 192 Ill. 2d 592, 615 (2000); see *In re G.O.*, 191 Ill. 2d 37, 49-50 (2000), citing *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996); *People v. Carlson*, 185 Ill. 2d 546, 551 (1999).

Here, Officer Barr was the only witness to testify at the suppression hearing. Although the defendant asserts that the trial court assessed Barr's credibility, nothing in the record suggests the court granted the suppression motion because it questioned Barr's credibility. Instead, the court suppressed the cocaine because it decided that Barr lacked reasonable suspicion to stop the defendant. Accordingly, our review is *de novo*.

Turning to the merits of the defendant's appeal, we need not decide whether the encounter between the defendant and Officers Barr and Stapleton was constitutionally permissible as community caretaking (see *People v. Murray*, 137 Ill. 2d 382, 387-88 (1990)) or a *Terry* stop because the issue of whether the defendant voluntarily consented to a search of his person is dispositive. The defendant contends that he never consented to a search of his person, but rather acquiesced to a show of police authority. The State contends that the defendant voluntarily consented. We agree with the defendant.

The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; accord Ill. Const. 1970, art. I, § 6; see *Fink v. Ryan*, 174 Ill. 2d 302, 314 (1996) ("This court has construed the search and seizure language found in section 6 in a manner that is consistent with the Supreme Court's fourth amendment jurisprudence"); *People v. Mitchell*, 165 Ill. 2d 211, 219 (1995). Reasonableness in this context generally requires a warrant supported by

probable cause. *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514 (1967).

However, a search conducted with a defendant's voluntary consent but without a warrant does not violate the fourth amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 36 L. Ed. 2d 854, 860, 93 S. Ct. 2041, 2045 (1973); *People v. Bull*, 185 Ill. 2d 179, 197 (1998). The validity of a consent search depends on the voluntariness of the consent. *People v. Bean*, 84 Ill. 2d 64, 69 (1981). Consent must be received, not extracted "by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228, 36 L. Ed. 2d at 863, 93 S. Ct. at 2048. "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth*, 412 U.S. at 229, 36 L. Ed. 2d at 864, 93 S. Ct. at 2049. The voluntariness of the consent is a question of fact determined from the totality of the circumstances, and the State bears the burden of proving the consent was truly voluntary. *People v. White*, 117 Ill. 2d 194, 221 (1987); accord *People v. Casazza*, 144 Ill. 2d 414, 417 (1991).

We have acknowledged that "there is little authority as to what constitutes consent in the absence of an express verbal statement." *People v. Henderson*, 142 Ill. 2d 258, 298 (1990). The defendant may convey consent to search by nonverbal conduct (see *In re M.N.*, 268 Ill. App. 3d 893, 897 (1994); *People v. Kessler*, 147 Ill. App. 3d 237, 241 (1986)), but "mere acquiescence to apparent authority is not necessarily consent" (*People v. Kelly*, 76 Ill. App. 3d 80, 87 (1979)). Accord *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 20 L. Ed. 2d 797, 802, 88 S. Ct. 1788, 1792 (1968) (the prosecution's burden to prove consent was voluntary "cannot be discharged by showing no more than acquiescence to a claim of lawful author-

ity"). In the case of nonverbal conduct, where dueling inferences so easily arise from a single ambiguous gesture, the defendant's intention to surrender this valuable constitutional right should be unmistakably clear.

Here, uniformed Officers Barr and Stapleton first contacted the defendant from 50 feet away, calling to him down an alley. Officer Barr asked the defendant about his business in the area and whom he knew in the apartment complex. Although Officer Barr did not threaten the defendant, the defendant's apprehension was apparent. According to Officer Barr, the defendant's voice stuttered, his hands shook, and he reached into and out of his pants pockets. Officer Barr became concerned and requested that the defendant keep his hands out of his pockets. After the defendant complied, Officer Barr continued to question the defendant by inquiring whether the defendant "had anything on him that he shouldn't have, anything like guns, drugs, knives, anything that could hurt me or my partner." The defendant replied no, but Officer Barr still asked for consent to search the defendant's person. The defendant then "assumed the position" of an arrestee: he "spread his legs apart and put his hands on top of his head."

The State would have us draw an inference from these facts that the defendant intended to consent, not acquiesce. An equally valid inference from the defendant's ambiguous gesture is that he submitted and surrendered to what he viewed as the intimidating presence of an armed and uniformed police officer who had just asked a series of subtly and increasingly accusatory questions. In essence, his message was "Do what you have to do." *Cf. United States v. Giuliani*, 581 F. Supp. 212, 218 (N.D. Ill. 1984) (a suspect's statement to drug enforcement agents to "Do what you have to do" does not constitute voluntary consent to search a suitcase). Considering the totality of the undisputed facts in this case, the

State failed to establish that the defendant voluntarily consented to a search of his person. The trial court correctly suppressed the cocaine.

## CONCLUSION

For the reasons we have discussed, we reverse the appellate court, affirm the trial court, and remand the cause to the circuit court.

*Appellate court judgment reversed;*
*circuit court judgment affirmed;*
*cause remanded.*

JUSTICE GARMAN took no part in the consideration or decision of this case.

JUSTICE THOMAS, dissenting:

In reversing the appellate court, the majority finds that defendant's gesture was similar to that of the defendant in *United States v. Giuliani*, 581 F. Supp. 212 (N.D. Ill. 1984), where the court found a defendant's statement did not constitute voluntary consent. However, as set forth below, the factual situation in *Giuliani* was drastically different from the factual situation in this case. In fact, the common thread between *Giuliani* and similar decisions is the fact that the officers in those cases proceeded to search even though the defendants had unequivocally objected or otherwise explicitly indicated that they did not consent to a search. Because I find this case to be distinguishable from those cases, I respectfully dissent from the majority opinion.

In *Giuliani*, the court found that the defendant's statement to a drug enforcement agency (DEA) agent to " 'Do what you have to do' " did not constitute voluntary consent to search a suitcase. *Giuliani*, 581 F. Supp. 212. In that case, the defendant was questioned by a DEA agent for 20 to 25 minutes even though he repeatedly refused to answer the agent's questions and declined the

agent's request to look in his bag. *Giuliani*, 581 F. Supp. at 214-15. When the agent, having obtained no information from the defendant, then told the defendant he might want a dog to sniff the defendant's bag, the defendant responded, " 'Do what you have to do.' " *Giuliani*, 581 F. Supp. at 214. The court held that the government had not sustained its burden of showing more than a mere submission to a claim of lawful authority by the defendant when he said, " 'Do what you have to do.' " *Giuliani*, 581 F. Supp. at 218.

The defendant in *Giuliani* clearly was aware that despite his refusal to answer questions and to allow the agent to look in his bag, the agent was going to continue to question him. Under the circumstances of that case, there is no question that the defendant did not consent to the search of his bag and instead was resigned to the fact that the agent would search his bag regardless. Here, unlike *Giuliani*, there is no evidence that defendant declined any of the officers' requests or that the officers proceeded over defendant's objections.

That defendant in this case did more than simply acquiesce is apparent when contrasted with other cases in which a defendant's conduct was found to be mere acquiescence to a show of police authority. For example, in *People v. Sweborg*, 293 Ill. App. 3d 298, 302 (1997), an officer asked the defendant if he could search the defendant's car trunk and the defendant replied, " 'No. I really don't want you to.' " The defendant continued to state that he did not want the officer to search the trunk, but when the officer had difficulty removing the defendant's keys from the car's ignition and began shaking the ignition, the defendant told the officer to push a button under the steering wheel to release the keys. *Sweborg*, 293 Ill. App. 3d at 302. Although the trial court found that the defendant had consented to the search when he told the officer how to release the keys, the ap-

pellate court refused to construe the defendant's statement as a consent to search, and instead found that the defendant's actions were consistent with a denial of consent to search. *Sweborg*, 293 Ill. App. 3d at 303.

Similarly, in *People v. Taylor*, 245 Ill. App. 3d 602, 603 (1993), the defendant's car was stopped by a state trooper because the car did not have a rear bumper. As the defendant was exiting the trooper's car after receiving a warning ticket, the trooper told the defendant that he also was a DEA agent and asked if he could conduct a routine search of the defendant's car. *Taylor*, 245 Ill. App. 3d at 603-04. When the defendant told the trooper that he had a long drive ahead of him and would just as soon be on his way, the trooper stated it would only take a minute and radioed for backup. *Taylor*, 245 Ill. App. 3d at 604. The trooper then exited his patrol car and began searching defendant's car. *Taylor*, 245 Ill. App. 3d at 604. The appellate court found that the defendant's statement to the trooper was not an unequivocal and specific consent to search and held that the trial court had properly granted the defendant's motion to suppress. *Taylor*, 245 Ill. App. 3d at 607-08.

Likewise, in *People v. Cardenas*, 237 Ill. App. 3d 584, 585 (1992), the defendant was pulled over by a state trooper, was given a warning citation for speeding, and was told that there was nothing more to the stop. The trooper, who was accompanied by two other state troopers by this time, then asked the defendant if she had any drugs or weapons in her vehicle. *Cardenas*, 237 Ill. App. 3d at 585. When defendant said no, the trooper asked the defendant if she would mind if he looked. *Cardenas*, 237 Ill. App. 3d at 585-86. The defendant paused, looked at her passenger, then said, " 'No, is that legal?' " (Emphasis omitted.) *Cardenas*, 237 Ill. App. 3d at 586. The trooper responded that it was legal and that they did it all the time. *Cardenas*, 237 Ill. App. 3d at 586. The

trooper also gave the defendant a consent form to sign, but told her that they would be taking her vehicle whether or not she signed the form. *Cardenas*, 237 Ill. App. 3d at 586. The court held that the defendant had signed the form in acquiescence to a show of lawful police authority, but did not consent, because the trooper had conveyed the false impression that it was legal to conduct the search even without her consent. *Cardenas*, 237 Ill. App. 3d at 588.

In each of the foregoing cases, the defendants had made it clear, through their words or actions, that they did not wish to consent to a search. Here, defendant never indicated to the officers, either verbally or through his actions, that he did not wish to answer the officers' questions or consent to a search. As such, I cannot agree with the majority that this case is so similar to *Giuliani* that the appellate court's decision cannot stand. I also cannot agree that defendant's conduct in this case was ambiguous. Rather, I find the facts of this case to be strikingly similar to those cases in which a defendant's conduct was found to convey consent to search.

For example, consent to enter a defendant's apartment was found where, in response to an officer's request to enter a defendant's apartment to find out what happened and to straighten things out, the defendant did not verbally respond but did open the door and step aside. *People v. Lozano*, 316 Ill. App. 3d 505, 510 (2000). Consent to open a vial was found where an officer asked the defendant if he would show him the vial, and in response, the defendant handed the vial to the officer. *In re M.N.*, 268 Ill. App. 3d 893, 896 (1994). Consent to enter an apartment also was found where a defendant opened the door for the police, then went inside and sat down at the kitchen table. *People v. Gross*, 166 Ill. App. 3d 413, 423 (1988); see also *United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000) (defendant conveyed her consent to

agents' entrance into her home where she opened her door and stepped back to allow entry); *United States v. Cotnam*, 88 F.3d 487, 490 (7th Cir. 1996) (consent to enter motel room conveyed where officer extended room key to defendant, defendant did not accept the key but gestured toward the door, and then walked inside room after officer had opened the door).

Consent to search a vehicle has been found where an officer asked a defendant if he could search the defendant's car, and the defendant responded, " 'I don't care—you can if you want to.' " *United States v. Baker*, 78 F.3d 1241, 1244 (7th Cir. 1996). Consent to search a bag was found where in response to an officer's question, " 'What's in that bag?' " the defendant handed the officer the bag. *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992). Finally, in a case quite similar to this case, at the conclusion of a traffic stop, a state trooper asked the defendant if there were any guns or drugs in the car. *United States v. Price*, 54 F.3d 342, 344 (7th Cir. 1995). The defendant said " 'no,' " and when the trooper asked the defendant, " 'Do you mind if I take a look?' " the defendant replied " 'sure.' " *Price*, 54 F.3d at 345. When the trooper then asked if he could pat the defendant down, the defendant said nothing "but raised his arms until they were almost horizontal to the ground." *Price*, 54 F.3d at 345. The trooper patted the defendant down, then asked the defendant to have a seat in the patrol car. *Price*, 54 F.3d at 345. The court found that defendant had consented to the search, noting that defendant never made any verbal objections or any physical gestures indicating objection. *Price*, 54 F.3d at 345.

Here, the officers asked defendant if they could talk to him, in response to which defendant stopped and waited for the officers to reach him. Because defendant was repeatedly putting his hands in his pockets, the officers asked defendant if he could keep his hands out of

his pockets, and defendant complied. The officers then asked defendant if he had anything on him that he should not have and the defendant answered "no." When the officers next asked if defendant would consent to a search of his person, defendant spread his legs apart and put his hands on top of his head. It is worth noting that when the officers asked for consent to search, defendant did not decline or hesitate, but instead "assumed the position."

If, as the majority finds, defendant's gesture in this case was ambiguous, it is difficult to conceive of any nonverbal gesture, short of nodding one's head in assent, that could be construed as unambiguous. The majority, then, effectively has eliminated nonverbal conduct as a means of conveying consent. Such a result, however, is contrary to prior decisions of this court recognizing that consent may be based upon nonverbal conduct. See *People v. Henderson*, 142 Ill. 2d 258, 297-98 (1990). Based upon the totality of the circumstances, I believe the State did establish that defendant voluntarily and unambiguously consented to a search of his person. For that reason, I would affirm the appellate court's decision.