No. 2--05--0772                    filed: 1/3/07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) | No. 04--CF--1456 |
| | ) | |
| JEREMY LONG, | ) ) | Honorable J. Edward Prochaska, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Jeremy Long, was charged with two counts of unlawful possession with intent to deliver cocaine (720 ILCS 570/401(a)(2)(A) (West 2002)) and unlawful use of a weapon by a felon (720 ILCS 5/ 24--1.1(a) (West 2002)), after the police found cocaine and a set of brass knuckles on his person. Defendant filed a motion to quash arrest and to suppress evidence as well as a motion to suppress statements, arguing that the pat-down search that led to the discovery of the brass knuckles was invalid. The State appeals the judgment of the circuit court of Winnebago County granting defendant's motions. We reverse and remand for further proceedings.

I. FACTS

At the hearing on the motions, the State called Todd McLester, a Rockford police officer. McLester testified that, on May 7, 2004, at approximately 10:15 p.m., he and several other Rockford police officers responded to an anonymous report that four individuals, all of whom had shaved heads

and three of whom were armed with handguns, had entered the El Navegante bar on 7th Street in Rockford. McLester indicated that the bar was located in a "very high-crime area," well known for prostitution and narcotics trafficking. McLester also said that on the night in question, he and the other officers had information from confidential informants that the bouncers at the El Navegante bar were selling cocaine. McLester explained that on six different occasions between March 2004 and May 7, 2004, he and other officers on the tactical team of the Rockford police department received this information regarding the bouncers from several street people and prostitutes in the 7th Street area.

McLester testified further that, upon entering the bar, he and his fellow officers dispersed and began questioning several of the patrons in the bar. McLester testified that both male and female patrons were questioned. McLester also testified that several male patrons were patted down for weapons. McLester acknowledged that it was "probabl[e]" that many, if not all, of the male patrons were patted down for weapons. McLester testified that he did not know whether the frisking was confined to males with shaved heads.

McLester testified that, as he was speaking to patrons, he saw two men, later identified as defendant and Marcelino Vargas, sitting at a table near the front door of the bar. McLester assumed that the two men were bouncers, given their location in the bar. McLester testified that Vargas's head was shaved and that defendant's hair was so closely cut that his head "could have been shaved." As McLester walked back toward the front door, he saw Rockford police sergeant Joe Caltagerone speak with Vargas and then arrest him. At the same time, McLester saw Rockford police officer Michael McDonald approach defendant and speak with him. McLester then observed defendant stand up and extend his arms out to his sides. McDonald patted defendant down and removed a set of brass

knuckles from his rear pants pocket. McLester testified that, as he observed this interaction, an officer directed his attention to a bottle, wrapped in gray duct tape, that was sitting on the footrest of the table were Vargas and defendant had been sitting. McLester testified that the bottle was found to contain narcotics and was the basis for Vargas's arrest.

Rockford police sergeant Joe Caltagerone testified that, on May 7, 2004, he and other officers, including McDonald and McLester, responded to a report that three armed males with shaved heads had entered the El Navegante bar. Caltagerone testified that he and his fellow officers "did a person-by-person check of every shaved head [sic] male subject in the bar." Elsewhere in his testimony, however, Caltagerone stated that the officers "checked every male patron in the bar." Caltagerone testified that by "checked," he meant patted down for weapons. Caltagerone testified that, after he and his fellow officers completed this "check," they walked back toward the front door. As they prepared to leave, they saw Vargas and defendant sitting across from each other on barstools at a table near the front door. Caltagerone testified that Vargas and defendant both had shaved heads but had not yet been "checked." Caltagerone approached Vargas and asked whether he had "anything on him." Caltagerone then took hold of Vargas's arm in preparation for frisking him. In doing so Caltagerone observed a white pill bottle, wrapped in duct tape, lying about one inch away from Vargas's left foot. Caltagerone recognized the bottle as the kind that is used to transport narcotics. Intending to check the bottle, Caltagerone "handed off" Vargas to other officers. As he bent down to retrieve the bottle, Caltagerone observed a plastic "baggy" and a loose baggy end lying on the floor between the wall and the table "about halfway between" defendant and Vargas. Inside the first baggy were "several smaller baggy ends" that were individually wrapped and contained a white powdery substance that was later determined to be cocaine. The loose baggy end also contained a white

powdery substance later determined to be 5.9 grams of cocaine. After finding the bottle and the baggies, Caltagerone asked McDonald to "check out" defendant, i.e., pat him down for weapons. Caltagerone testified that there were between 35 and 40 patrons in the bar when he and the other officers entered.

Officer Michael McDonald testified that, on May 7, 2004, he and fellow officers went to the El Navegante bar in response to a call that "four subjects with shaved heads, possibly Mexican males[,] had entered the bar" and that the men were armed with guns. When McDonald entered the bar, he saw other officers "checking the patrons of the bar for weapons." While he was in the bar, McDonald saw two men, later identified as defendant and Vargas, seated at a table. McDonald witnessed fellow officer Caltagerone recover a pill bottle from the floor under the table. Caltagerone then asked McDonald to "detain" defendant. Accordingly, McDonald asked defendant to stand. McDonald testified: "As [defendant] stood up, I asked him if I could check him for weapons, any contraband, and he consented." McDonald testified that, after defendant "consented," he stood up, spread his feet, and held his arms out. McDonald did a pat-down search of defendant and found a set of brass knuckles in a rear pocket of his pants. McDonald placed defendant under arrest. McDonald then performed a full search of defendant, finding several small plastic bags containing a substance that was later determined to be cocaine.

McDonald testified that he was in the bar for about five minutes before he performed the pat-down search of defendant. During that interval, McDonald saw fellow police officers perform pat-down searches of other patrons in the bar. McDonald testified that, to the best of his recollection, all male patrons of the bar were "checked out," i.e., frisked for weapons, that night.

On cross-examination, McDonald acknowledged that he wrote the following in his report:

" '[Defendant] was asked to stand up so he could be checked for weapons and he complied.

*** [Defendant] stood up and held his arms out to his side so officers could check him. I

began to pat down [defendant] over his clothing.' "

McDonald clarified that defendant said nothing in response to McDonald's requests but simply stood

up, spread his feet apart, and raised his arms to about shoulder height. McDonald also testified that

he never informed defendant that he had the option of refusing to be searched.

The State introduced into evidence a booking photograph of defendant from the night of his

arrest. Defendant's hair is closely cropped in the photograph.

Defendant was the sole witness for the defense. Defendant testified that he was sitting at a

table near the door of the El Navegante bar when the police entered. On cross-examination,

defendant admitted that he was a bouncer at the El Navegante bar. According to defendant, the

police performed pat-down searches of the male patrons. After a few minutes, an officer approached

Vargas, who was sitting with defendant at the table. The officer "grabbed [Vargas's] arm and

detained him." The officer searched Vargas by "reaching in his pockets and waistband." The officer

directed a second officer over to defendant and said "check that one." When asked what happened

next, defendant related as follows:

"A. The officer told me to get up, and I stood up.

Q. Okay. Did he say anything else?

A. Umm. He told me to put my arms out and started searching.

Q. He told you to put your arms out?

A. Yes.

Q. Did you put your arms out?

A. Yes.

Q. Okay. What did he do then?

A. He started searching me.

Q. Okay. Did the officer, to the best of your ability, did the officer ask you whether or not you wanted to get up?

A. No.

* * *

Q. *** Do you remember whether he asked you if he could check you for weapons?

A. No.

Q. No what?

A. No, he didn't ask me if he could check me for weapons.

Q. Okay. Did he then--did he search you?

A. Yes.

Q. Did he give you any choice as to whether or not you would be searched?

A. No."

The trial court agreed with defendant that there was no justification for the search that led to the discovery of the cocaine on his person. The trial court rejected the various theories the State posited in defense of the search. First, the trial court found that defendant did not consent to the pat-down search that led to the discovery of the brass knuckles on his person, which in turn led to his arrest and incidental search. The trial court found that the interaction between defendant and McDonald occurred just as described in McDonald's report:

"I think [McDonald's] report is very accurate in terms of what he did. He said the defendant was asked to stand up and be checked for weapons and complied. That's what his report says, and I think that's what he did. He asked him to stand up, I'm going to check you for weapons, stand up so I can check you for weapons, and he complied."

Based on these findings, the trial court concluded that defendant did not freely agree to the pat-down search:

"I don't--I don't believe that this can be considered to be a request for consent or a voluntary consent. [McDonald] may have asked [defendant] to stand up, but he wasn't giving him an option. He wasn't you know, saying, may I have consent to search you for weapons? He was directing him. He was directing him to stand up. He asked him to stand up and be checked for weapons, and he complied. [Defendant] was acquiescing to what--the officers were in control of the situation, and they needed to be in control of the situation. It was a potentially dangerous situation, and problems [sic] with the officers being there in force and being in control of the situation, it's essential that they do that.

*** It was not a free and voluntary consent at all. [Defendant] had been sitting there watching every other male person in the bar being searched, they came to him, it was his turn, stand up, I'm gonna search you for weapons, he stood up and was searched ***. The officers, acting on an anonymous tip, frisked the defendant and every other male subject in the bar without asking for consent ***."

Next, the trial court found that the anonymous tip did not justify the pat-down search of defendant. The trial court described the tip as mentioning armed men who "had shaved heads and were possibly I believe Hispanic." Defendant did not meet this description, the trial court found,

because though he "had short hair clearly, *** he did not have a shaved head and he is Caucasian, not Hispanic." The court also found that the police had no particular reason to suspect that defendant posed a threat.

Last, the trial court determined that the arrest of defendant, and the full search that followed, was not independently justified by the plastic bag of cocaine that was discovered on the floor near defendant's feet prior to his arrest. The court held that the contraband may have "[given] the police reason to question [defendant]" but did not provide probable cause to arrest him.

The trial court granted defendant's motions to quash arrest and to suppress evidence. The State filed this timely appeal.

## II. ANALYSIS

On appeal, the State argues first that the officers had probable cause to arrest defendant such that the pat-down search of defendant was lawful incident to arrest. Second, the State argues that the pat-down search was a lawful Terry frisk. Finally, the State argues that defendant consented to the pat-down search. Because we find that the State's first argument has merit, we do not reach its second and third arguments.

When reviewing a trial court's ruling on a motion to suppress, we apply a two-tiered standard of review:

"Findings of historical fact made by the circuit court will be upheld on review unless such findings are against the manifest weight of the evidence. This deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony. However, a reviewing court remains free to undertake its own assessment of the

facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted. Accordingly, we review de novo the ultimate question of whether the evidence should be suppressed." People v. Jones, 215 Ill. 2d 261, 268 (2005).

We hold that at the time McDonald patted defendant down, the officers had probable cause to arrest defendant for actual possession of the baggies of cocaine found under the bar table. Therefore, the challenged pat-down search was a lawful search incident to arrest. See Chimel v. California, 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969). Consequently, we reverse the judgment of the trial court and remand for further proceedings.

Probable cause exists if there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." United States v. DeFillippo, 443 U.S. 31, 37, 61 L. Ed. 2d 343, 349-50, 99 S. Ct. 2627, 2632 (1979). The objective reasonableness of the facts relevant to a probable cause determination is paramount, and the officer's subjective intentions are irrelevant. See Whren v. United States, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 98, 116 S. Ct. 1769, 1774 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); Ornelas v. United States, 517 U.S. 690, 696, 134 L. Ed. 2d 911, 918, 116 S. Ct. 1657, 1661 (1996) (holding that probable cause is assessed from the perspective of an objectively reasonable police officer). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371, 157 L. Ed. 2d 769, 775, 124 S. Ct. 795, 800 (2003), quoting Ornelas, 517 U.S. at 696, 134 L. Ed. 2d at 919,

116 S. Ct. at 1661-62. Where officers are working together in investigating a crime, the knowledge of each constitutes the knowledge of all, and probable cause can be established from all the information collectively received by the officers. People v. Ortiz, 355 Ill. App. 3d 1056, 1065 (2005).

A proper analysis of the probable cause issue in this case has two steps. **First, it must be determined whether, under the totality of the circumstances, it was reasonable to infer that a crime had been committed. If so, secondly, it must be determined whether, under the totality of the circumstances, it was objectively reasonable for the officers to infer that defendant committed that crime.** This second step requires a determination of whether the probable cause was particularized with respect to defendant. See Ybarra v. Illinois, 444 U.S. 85, 91, 62 L. Ed. 2d 238, 245, 100 S. Ct. 338, 342 (1979) ("a search or a seizure of a person must be supported by probable cause particularized with respect to that person"). We find the United States Supreme Court's analysis in Pringle, 540 U.S. 366, 157 L. Ed. 2d 769, 124 S. Ct. 795, useful in conducting this two-step analysis.

In Pringle, a police officer stopped a Nissan Maxima for speeding and located $763 in the glove compartment and five glassine baggies of cocaine behind the backseat armrest. Pringle, 540 U.S. at 368, 157 L. Ed. 2d at 773, 124 S. Ct. at 798. The Nissan was occupied by three men, and the defendant was the front-seat passenger. Pringle, 540 U.S. at 368, 157 L. Ed. 2d at 773, 124 S. Ct. at 798. When questioned, none of the three men offered any information regarding the ownership of the drugs or money. Pringle, 540 U.S. at 368-69, 157 L. Ed. 2d at 774, 124 S. Ct. at 798. The officer placed all three men under arrest. Pringle, 540 U.S. at 369, 157 L. Ed. 2d at 774, 124 S. Ct. at 798. Later, the defendant told police that the cocaine belonged to him and that the other two occupants of the Nissan did not know about the drugs. Pringle, 540 U.S. at 369, 157 L. Ed. 2d at 774, 124 S. Ct. at 798. After the trial court denied the defendant's motion to suppress his confession

as the fruit of an illegal arrest unsupported by probable cause, a jury convicted the defendant. Pringle, 540 U.S. at 369, 157 L. Ed. 2d at 774, 124 S. Ct. at 799. The Court of Special Appeals of Maryland affirmed the trial court's judgment but the Court of Appeals of Maryland reversed, holding that there was no probable cause to arrest the defendant. Pringle, 540 U.S. at 369, 157 L. Ed. 2d at 774, 124 S. Ct. at 799.

The Supreme Court granted certiorari and reversed the Court of Appeals of Maryland, holding that the officer had probable cause to believe that the defendant committed the crime of possession of a controlled substance. Pringle, 540 U.S. at 374, 157 L. Ed. 2d at 777, 124 S. Ct. at 802. In conducting its analysis, the Pringle Court first noted that upon recovering the cocaine from the Nissan, the officer had probable cause to believe that the felony offense of possession of a controlled dangerous substance had been committed. Pringle, 540 U.S. at 370, 157 L. Ed. 2d at 774-75, 124 S. Ct. at 799. As such, the sole question, according to the Court, was whether the officer had probable cause to believe that the defendant committed that crime. Pringle, 540 U.S. at 370, 157 L. Ed. 2d at 775, 124 S. Ct. at 799. In concluding that the officer had probable cause to arrest the defendant, the Court wrote:

"In this case, Pringle was one of three men riding in a Nissan Maxima at 3:16 a.m. There was $763 of rolled-up cash in the glove compartment directly in front of Pringle. Five plastic glassine baggies of cocaine were behind the back-seat armrest and accessible to all three men. Upon questioning, the three men failed to offer any information with respect to the ownership of the cocaine or the money.

We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine.

-11-

Thus, a reasonable police officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly." Pringle, 540 U.S. at 371-72, 157 L. Ed. 2d at 776, 124 S. Ct. at 800-01.

In rejecting the defendant's attempt to characterize the case as a guilt-by-association case, the Court held further:

"Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." Pringle, 540 U.S. at 373, 157 L. Ed. 2d at 777, 124 S. Ct. at 801.

The first step of the analysis, that is, whether it was reasonable to infer that a crime was committed, was quickly resolved in Pringle. The Court declared that it was uncontested that the officer had probable cause to believe that a felony had been committed. Similarly, in this case, it was reasonable to infer that someone committed a crime. See 720 ILCS 570/402 (West 2004) (except as authorized by the Illinois Controlled Substances Act, it is unlawful for any person to possess any amount of cocaine).

With respect to the second step of the analysis, whether there was particularized probable cause as to defendant, defendant suggests that the cocaine just happened to be under the table at this inopportune time, unbeknownst to him and Vargas. While this is possible, a far more reasonable inference is that defendant, Vargas, or both men had cocaine on their persons and discarded it upon observing police officers enter the bar and begin to question and pat down patrons. Even in a bar in a "very high-crime area" known for prostitution and narcotics trafficking, it is reasonable to infer that

cocaine in **substantial** quantities is rarely dropped inadvertently on the floor. Cocaine is a valuable illegal substance, ordinarily handled with care. See People v. Nettles, 23 Ill. 2d 306, 308 (1961) ("Because of this illegitimate nature of narcotics, they are sold for exorbitant sums on the black market and are therefore of great value to the person possessing them. Furthermore, since their mere possession may subject such person to severe criminal consequences, the narcotics traffic is conducted with the utmost secrecy and care"). Moreover, it is unlikely that, in the rare event that cocaine is inadvertently dropped on a bar floor, the valuable and addictive substance would remain there very long. In our judgment, cocaine is more often deposited upon the ground when individuals unexpectedly approached by the police hasten to disassociate themselves from the substance, for fear of criminal prosecution.

An additional indication that the cocaine was intentionally and not inadvertently deposited beneath the table was the precise location in which the cocaine was discovered. Photographs admitted at the hearing on defendant's motions show that the table at which Vargas and defendant were sitting was a rectangular wooden table, bar-height, situated perpendicular to the bar wall. The base of the table rests on a pedestal of sorts. The pedestal is also rectangular and roughly the size of the table top such that persons sitting on bar stools around the table can rest their feet on the pedestal. The table was pushed up against the wall so that there was little if any gap between the wall and the table top or the wall and the pedestal. According to Caltagerone, who located the narcotics, the baggies of cocaine were located between the wall and the table an equal distance between defendant and Vargas. Caltagerone indicated that "unless you are looking for it you are not going to see it back there." Based on the foregoing, it was reasonable to infer that the cocaine had been secreted away between the wall and the table in an intentional effort to conceal it.

In addition to the presence of the cocaine and its location, there was other evidence presented from which a reasonable officer could infer a connection between the cocaine found under the table and the men sitting at the table. McLester testified that, on six different occasions between March 2004 and May 7, 2004, he and other officers on the tactical team of the Rockford police department received information from several street people and prostitutes in the 7th Street area serving as confidential informants that the bouncers at the El Navegante bar were selling cocaine. A combination of tips from informants and first-hand corroborative observation of suspicious activity will provide probable cause for an arrest. United States v. McCraw, 920 F.2d 224, 227 (4th Cir. 1990), citing Alabama v. White, 496 U.S. 325, 110 L. Ed. 2d 301, 110 S. Ct. 2412 (1990), and Illinois v. Gates, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983); United States v. Shepherd, 714 F.2d 316, 317 (4th Cir. 1983). McLester also testified that he assumed that Vargas and defendant were the bar's bouncers on the night in question because they were sitting at the table closest to the front door, where the bouncers would ordinarily sit. Additionally, the recovered cocaine was itself evidence of illegal drug dealing because the cocaine was, at least in part, individually wrapped in small amounts, presumably for individual sale. Bouncers generally remain at their posts such that bar patrons do not typically occupy the bouncers' station, making it reasonable to infer that it was unlikely that anyone other than the bouncers deposited the cocaine under the table at which the bouncers were stationed. The reasonable inference is that the quantity of cocaine, a portion of which was packaged for individual sale, discovered under the table at which the bar's bouncers were sitting, within a bar from which the bouncers were suspected of dealing cocaine, was put there by one or both of the bouncers. It is important to remain mindful that a probable cause determination tolerates the existence of other inferences from the evidence that point to noncriminal

behavior, as long as the inferences supporting arrest remain reasonable. While the degree of probability for purposes of establishing probable cause that a suspect committed a crime has not been defined with precision, it is clear that the standard is something less than demonstrating that it is more likely than not that the suspect committed a crime. Jones, 215 Ill. 2d at 277, quoting Texas v. Brown, 460 U.S. 730, 742, 75 L. Ed. 2d 502, 514, 103 S. Ct. 1535, 1543 (1983) (plurality opinion) ("Probable cause, i.e., sufficient evidence to justify the reasonable belief that the defendant has committed or is committing a crime, 'does not demand any showing that such a belief be correct or more likely true than false' "); People v. Burks, 355 Ill. App. 3d 750, 757 (2004) ("probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed the crime"); United States v. Funches, 327 F.3d 582, 586 (7th Cir. 2003) (finding of probable cause does not require evidence demonstrating that it is more likely than not that the suspect committed a crime). In this case, even if we apply the more exacting standard of "more likely than not," there was probable cause to believe that defendant, Vargas, or both men committed the offense of possession of cocaine. Thus, irrespective of the possibility **that the cocaine had not been discarded by Vargas or defendant and was present unbeknownst to either, the inference that one or both of the men discarded the cocaine when the police entered the bar is reasonable.**

Our analysis, however, is not complete. Pringle recognizes that something more than proximity to illegal contraband is required to meet the particularized probable cause requirement. In Pringle, that something was the unlikelihood of the admittance of an innocent person to the small confines of an automobile containing evidence of illegal drug dealing. In Pringle, the evidence of drug dealing was the quantity of cocaine (five glassine baggies) together with $763 of rolled-up cash in the

glove compartment. Pringle, 540 U.S. at 373, 157 L. Ed. 2d at 777, 124 S. Ct. at 801. Like Pringle, there was evidence of drug dealing in this case, specifically, the information from confidential informants that the bouncers at the bar in question were selling cocaine, together with the quantity of cocaine, a portion of which was individually packaged. In Pringle, the Court concluded that it was reasonable to infer a common enterprise among the three men in the Nissan because a drug dealer is not likely to admit an innocent person to a vehicle containing evidence of drug dealing, for fear that the innocent person might provide evidence against him. Pringle, 540 U.S. at 373, 157 L. Ed. 2d at 777, 124 S. Ct. at 801. The reasonable inference of a common enterprise between Vargas and defendant is similarly reached. Where a bar's bouncers are known to deal drugs, it is reasonable to infer that both bouncers simultaneously working the bar's door are engaged in drug dealing. It would be difficult for one bouncer to engage in such an activity without his partner detecting it and thereby gaining the potential to furnish evidence against him. As such, we conclude that there was particularized probable cause that defendant had actual possession of the cocaine sometime before the officers discovered it.

We recognize that the Court in Pringle distinguished the relatively small automobile that the defendant and his companions occupied from the public tavern in which the defendant in Ybarra was located. Pringle, 540 U.S. at 373, 157 L. Ed. 2d at 776-77, 124 S. Ct. at 801. In this case, however, it is important to note that an inference of common enterprise is not reached based on Vargas's and defendant's presence in a public tavern. Rather, the inference is based on their roles as bouncers, and the concomitant activities of bouncers, in a bar where the bouncers were known to deal cocaine.

### III. CONCLUSION

In sum, we conclude, in a fashion similar to the Court in Pringle, that it is an entirely reasonable inference from the historical facts that both defendant and Vargas were engaged in illegal drug dealing and that **both men** had actual possession of the cocaine before the officers entered the bar. Consequently, we hold that a reasonable officer could conclude that there was probable cause to believe that defendant committed the offense of possession of cocaine, either solely or jointly. The fact that McDonald may have thought the pat down was otherwise justifiable is of no relevance (see Whren, 517 U.S. at 813, 135 L. Ed. 2d at 98, 116 S. Ct. at 1774).

For the foregoing reasons, we reverse the judgment of the circuit court of Winnebago County and remand this cause for further proceedings.

Reversed and remanded.

GILLERAN JOHNSON, J., concurs.

JUSTICE O'MALLEY, dissenting:

I disagree with the majority that there was probable cause to arrest defendant for possession of the plastic bags of cocaine found on the floor beneath the table at which he was sitting.

Pringle is an odd choice to be the majority's primary authority. The Supreme Court defended its holding in Pringle by noting that the defendant "[was] in a relatively small automobile, not a public tavern" (Pringle, 540 U.S. at 373, 157 L. Ed. 2d at 776, 124 S. Ct. at 801). The majority extends the reasoning of Pringle to an arrest that occurred in "a public tavern" under circumstances that are nothing like Pringle.

The "public tavern" case that Pringle referenced was Ybarra v. Illinois, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979). (Incidentally, defendant relies extensively on Ybarra but the majority scarcely mentions the case.) In Ybarra, the police applied for a warrant based on an informant's tip

that he had seen what appeared to be packets of heroin in the possession of the bartender at an Aurora tavern and that the bartender told him that he would have heroin for sale at the tavern on a particular day. The police obtained a warrant to search both the person of the bartender and the tavern for contraband. They executed the search warrant on the date specified in the informant's tip. The police performed pat-down searches of all patrons found on the premises, including the defendant, Ybarra. Contraband was found during the frisk of Ybarra. The Supreme Court held that the frisk was unlawful because the informant had implicated no individual but the bartender in criminal activity, and the police made no observations of Ybarra while on the premises that might have supported a suspicion of criminal activity. Therefore, the only potential basis for frisking Ybarra was his presence on premises suspected to contain contraband and his proximity to an individual who was suspected of criminal activity. The Court held that this connection did not supply probable cause to search Ybarra:

> "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. [Citation.] Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." Ybarra, 444 U.S. at 91, 62 L. Ed. 2d at 245, 100 S. Ct. at 342.

The Court further held that the facts did not meet even the lower threshold for protective searches recognized in Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The Court explained that Terry "does not permit a frisk for weapons on less than reasonable belief or suspicion

directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." Ybarra, 444 U.S. at 94, 62 L. Ed. 2d at 247, 100 S. Ct. at 344.

The Court in Pringle rejected the defendant's claim that his case was "a guilt-by-association case" like Ybarra. Pringle, 540 U.S. at 372, 157 L. Ed. 2d at 776, 124 S. Ct. at 801. The Court found that the facts before it were "quite different" from those of Ybarra:

"[Defendant] and his two companions were in a relatively small automobile, not a public tavern. *** [W]e [have] noted that 'a car passenger--unlike the unwitting tavern patron in Ybarra--will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits of the evidence of their wrongdoing.' [Citation.] Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." Pringle, 540 U.S. at 373, 157 L. Ed. 2d at 776-77, 124 S. Ct. at 801.

The Court did not expressly state what differences between a "public tavern" and a "relatively small automobile" it considered relevant for purposes of the probable cause analysis, but those differences may readily be inferred. Predominant among them are the larger spatial area of a tavern, the vastly greater number of persons present at any given time, and the continually shifting nature of that population, consisting as it does of patrons whose presence is largely transient. What this means is that, generally, the presence of contraband in proximity to an individual in a "public tavern" will admit of more explanations that exclude the individual than if the contraband and the individual were

present together in a "relatively small automobile." Ironically, the majority applies Pringle to the very factual scenario that the Supreme Court stressed was not present in that decision.

I recognize, of course, that the arrest of a tavern occupant for possession of nearby contraband will be permissible in some circumstances. This, however, is not one of those cases. The majority's reasoning proceeds in an orderly way, premise upon premise, but there are several loose seams. The majority's first premise is that "it was reasonable to infer that the cocaine had been secreted away between the wall and the table in an intentional effort to conceal it." Slip op. at 13. The majority suggests that, while it is "possible" that the "cocaine just happened to be under the table at this inopportune time, unbeknownst to [defendant] and Vargas," it is "far more reasonable" to infer that "defendant, Vargas, or both men had cocaine on their persons and discarded it upon observing police officers enter the bar and begin to question and pat down persons" than to infer that the cocaine was left there "inadvertently." Slip op. at 12-13. This is so, the majority states, because "cocaine in substantial quantities is rarely dropped inadvertently on the floor," and, if it is so dropped, it is "unlikely" to "remain there very long." Slip op. at 13. "[C]ocaine," the majority observes, "is more often deposited upon the ground when individuals unexpectedly approached by the police hasten to disassociate themselves from the substance, for fear of criminal prosecution." Slip op. at 13.

This is an uneasy chain of inferences. The majority claims that, because the cocaine was discovered during the police activity in the bar, it is not just probable that the cocaine on the floor was deposited there intentionally, but that this is actually far more likely than that the cocaine was dropped there inadvertently. The majority envisions defendant discarding the cocaine as the radius of the police activity edged toward him. Defendant lacks standing to challenge the legitimacy of the police

searches that preceded the search of his own person and, on the majority's theory, caused him to discard the cocaine. Even so, I cannot overlook that the general sweep of the premises here nearly duplicated the heavy-handed tactics found illegitimate in Ybarra, and I believe that the majority improvidently signals today that police may deliberately "flush out" from an individual evidence of illegal activity by utilizing unconstitutional means that the individual lacks standing to challenge. This aside, I cannot agree with the majority's comparison of probabilities. The majority's foundation for believing that it is more likely that the cocaine was intentionally discarded during the raid than that it was left there inadvertently at some prior time is that, if the latter were true, the cocaine would not have been there "very long," given its high value. Slip op. at 13. Probable cause to arrest exists where there is a fair probability that a crime was committed and that the defendant committed it. People v. Brannon, 308 Ill. App. 3d 501, 505 (1999). Probable cause may not rest on mere hunch or speculation (People v. Little, 322 Ill. App. 3d 607, 612 (2001)), but these are precisely what the majority leans on here. There was no evidence at the suppression hearing of how long contraband will remain on the floor of a bar full of patrons before it is snatched up. The majority fails to factor into its analysis the possibility that the allure of cocaine is not so strong that just anyone will be willing to pick that illegal substance off the floor in a public place. This court lacks the wherewithal even to begin to conceptualize the likelihood of the cocaine remaining on the floor 5 minutes or 10 minutes or 15 minutes. The timing is critical, but the probabilities here are too elusive to measure. Wispy notions like these do not amount to the "fair probability" required for probable cause.

I recognize that the majority cites, as further evidence that the cocaine was discarded intentionally, the fact that it was found on the floor in a narrow space between the table and the wall.

-21-

Officer Caltagerone testified that "unless you are looking for [the cocaine] you are not going to see it back there." The majority concludes that it is reasonable to infer that the cocaine "had been secreted away." Slip op. at 13. Though reasonable, this inference begs the question of when and by whom the cocaine was secreted away. The majority's theory, of course, is that the cocaine was secreted away when the police arrived. Presumably, the majority again is depending on the vague notion that the cocaine could not have been there "very long." However, if the cocaine was fairly well hidden, as the evidence suggests, then perhaps it could have remained there a significant period of time. Could there not have been some reason for someone in the El Navegante bar to hide cocaine sometime before the Rockford police entered the bar on May 7, 2004, at 10:15 p.m.?

After concluding that the police could have reasonably inferred that the cocaine had been intentionally placed on the floor beneath defendant's and Vargas's table, the majority proceeds to find that the police could have also reasonably inferred "that one or both of the men discarded the cocaine when the police entered the bar." Slip op. at 15. The majority suggests that this inference was supported by the location of the cocaine, which corroborated past tips from confidential informants that the bouncers at the bar were selling cocaine. The tips concerned illegal activity by some unidentified "bouncers," but for the arrest to be proper, the police would have had to possess probable cause particularized to an individual. The majority believes that this particularity was established by defendant's and Vargas's proximity to the cocaine, which, in the majority's view, supplied probable cause to believe that at least one of the men was in actual possession of the cocaine. However, "[m]ere proximity is not sufficient evidence of actual possession [citation], and knowledge of the location of contraband is not the equivalent of possession but merely a necessary element of possession [citation]" (People v. Schmalz, 194 Ill. 2d 75, 81-82 (2000)). Although actual

possession does not require present personal touching of the contraband, there must be present personal dominion over the contraband. Schmalz, 194 Ill. 2d at 82. The majority can only speculate that either or both of these men were aware of the cocaine on the floor, but even their knowledge of the cocaine would not be sufficient to fulfill the elements of actual possession.

I do not dispute the majority's inference that Vargas and defendant were the bar's bouncers. I do question, however, the majority's attempt to exclude other possible perpetrators. The majority says: "Bouncers generally remain at their posts such that bar patrons do not typically occupy the bouncers' station, making it reasonable to infer that it was unlikely that anyone other than the bouncers deposited the cocaine under the table at which the bouncers were stationed." Slip op. at 14. There are a number of problems here. First, there is no evidence in the record concerning the duties of bouncers; if extrajudicial knowledge is now fair game, I would submit that, in addition to their doorkeeping tasks, which generally can be performed in a seated position, bouncers have enforcement duties that take them away from their posts, and neither I nor the majority know how bouncers generally divide their time between these different duties. Second, I do not believe that Vargas and defendant would have had to leave their posts in order for a third party to have the opportunity to deposit the cocaine under their table. Someone could have dropped the cocaine there with a subtle motion while walking by the table or while conversing with defendant or Vargas, or could have tossed the cocaine under the table from some distance during the bustle of activity brought about by the police entry and search. Of course, these are all conjectures, but the majority's inferences are equally conjectural. At the very least, my conjectures are not fanciful enough to be dismissed out of hand as "unlikely."

Once finding that the facts supported an inference that either defendant or Vargas dropped the cocaine, the majority concludes that this inference alone was enough to arrest defendant. Relying on Pringle, the majority reasons that "[i]t would be difficult for one bouncer to engage in [drug dealing] without his partner detecting it and thereby gaining the potential to furnish evidence against him." Slip op. at 16. The Court in Pringle, however, found a common enterprise based on the close confines of the car in which the defendant and his companions were found, and it expressly distinguished a car from "a public tavern." Pringle, 540 U.S. at 373, 157 L. Ed. 2d at 776-77, 124 S. Ct. at 801. Rather than explore the differences between these two types of settings--differences that the Supreme Court found important in distinguishing Pringle from Ybarra--the majority simply stresses that its "inference of common enterprise is not reached based on Vargas's and defendant's presence in a public tavern" but rather "is based on their roles as bouncers, and the concomitant activities of bouncers, in a bar where the bouncers were known to deal cocaine." Slip op. at 16.

The first assertion here is nonresponsive to the issues at hand, since my claim is not that the majority finds probable cause "based on" defendant's presence in a public tavern, but that it (improperly) finds probable cause despite defendant's presence in a public tavern. There are far more opportunities for a bouncer in a public tavern to carry out his drug transactions outside his partner's knowledge than there are for the occupant of a car to transact such business without the knowledge of his fellow occupant. This was precisely Pringle's point in distinguishing Ybarra. Interestingly, the majority seems to credit the drug-dealing bouncer with little wit. The majority evidently assumes that this bouncer, though aware of another's proximity, would be incautious enough to dispense drugs from the table where they both sat rather than to distribute them while going to the restroom or taking a break or during some other occasion to leave the table.

As for the majority's second assertion, i.e., that its finding of probable cause "is based on [defendant's and Vargas's] roles as bouncers, and the concomitant activities of bouncers" (slip op. at 16), I simply reiterate that the majority's claims about the activities of bouncers are unsubstantiated by the record. Finally, the claim that the bouncers in the El Navegante bar "were <u>known</u> to deal cocaine" (emphasis added) (slip op. at 16) simply is not borne out by the record and is in fact a far stronger claim than the majority needs to make.

For the foregoing reasons, I conclude that the police lacked probable cause to arrest defendant for possession of the cocaine found underneath his table.

I also reject the remaining bases that the State offers to sustain the arrest of defendant. First, the State argues that defendant consented to the pat-down search that led to the discovery of the brass knuckles on his person, which in turn led to his arrest. Defendant urges this court to find this argument waived because the State fails to cite any authority or provide any analysis. I agree that the argument is waived. See Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001 (an appellant's brief shall include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on").

Even if this argument were not waived, I would find that it lacks merit. It is well settled that an individual may voluntarily consent to a search, thereby eliminating the need for probable cause and a warrant. <u>People v. Smith</u>, 214 Ill. 2d 338, 349 (2005). For consent to be voluntary, it "must be received, not extracted 'by explicit or implicit means, by implied threat or covert force.' " <u>People v. Anthony</u>, 198 Ill. 2d 194, 202 (2001), quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 228, 36 L. Ed. 2d 854, 863, 93 S. Ct. 2041, 2048 (1973). Whether a defendant's consent to a search was

voluntary is a question of fact determined from the totality of the circumstances. Smith, 214 Ill. 2d at 350. " 'In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.' " Anthony, 198 Ill. 2d at 202, quoting Schneckloth, 412 U.S. at 229, 36 L. Ed. 2d at 864, 93 S. Ct. at 2049. The State bears the burden of proving that the defendant's consent was voluntary. Anthony, 198 Ill. 2d at 202.

Defendant and McDonald presented conflicting accounts of the circumstances surrounding the pat-down search of defendant. McDonald testified that he "asked" defendant to stand and then "asked" whether he could search defendant. Defendant, however, testified that McDonald "told" him to get up and "told" him to raise his arms. Defendant also testified that McDonald did not give him a choice whether or not to comply. The trial court accepted a third version of the interaction, presented in McDonald's police report, according to which McDonald "asked [defendant] to stand up so he could be checked for weapons." There is no dispute that defendant gave no verbal response to McDonald's request.

Based on these facts as found by the trial court, I find this case indistinguishable in all relevant respects from our supreme court's decision in Anthony. There, police officers Barr and Stapleton were on routine patrol when they saw the defendant exit a residence in which they knew he did not live. Anthony, 198 Ill. 2d at 197. Officer Barr called to the defendant, " 'Excuse me sir. Can I talk to you for a minute?' " Anthony, 198 Ill. 2d at 198. The defendant stopped and allowed the officers to approach. Anthony, 198 Ill. 2d at 198. Officer Barr asked the defendant what he was doing in the area and whom he knew at the residence from which he came. Anthony, 198 Ill. 2d at 198. The defendant told Officer Barr that he was there visiting a certain female. Anthony, 198 Ill. 2d at 198.

The defendant appeared nervous and repeatedly reached into his pants pockets. Anthony, 198 Ill. 2d at 198. As a consequence, Officer Barr asked the defendant to "please" keep his hands out of his pockets for his and his partner's safety. Anthony, 198 Ill. 2d at 198. The defendant complied, and Officer Barr asked him " 'if he had anything on him that he shouldn't have, anything like guns, drugs, knives, anything that could hurt [Officer Barr] or [his] partner.' " Anthony, 198 Ill. 2d at 198. The defendant answered no. Anthony, 198 Ill. 2d at 198. When Officer Barr asked the defendant if he would consent to a search of his person, the defendant, according to Officer Barr, " 'assumed the position,' " that is, he spread his feet and placed his hands on top of his head. Anthony, 198 Ill. 2d at 198. The search that followed uncovered cocaine on the defendant's person. Anthony, 198 Ill. 2d at 199.

After recognizing that the voluntariness of consent is a question of fact determined from the totality of the circumstances (Anthony, 198 Ill. 2d at 202), the supreme court held that the State failed to prove that the defendant voluntarily consented to the search of his person (Anthony, 198 Ill. 2d at 204). The court explained that a defendant "may convey consent to search by nonverbal conduct [citations], but 'mere acquiescence to apparent authority is not necessarily consent.' " Anthony, 198 Ill. 2d at 202, quoting People v. Kelly, 76 Ill. App. 3d 80, 87 (1979). The court concluded that the defendant's nonverbal actions were ambiguous and, though it could be inferred that the defendant "intended to consent, not acquiesce," it was equally possible that he "submitted and surrendered to what he viewed as the intimidating presence of an armed and uniformed police officer who had just asked a series of subtly and increasingly accusatory questions." Anthony, 198 Ill. 2d at 203.

Defendant's consent was given in circumstances that were at least as coercive as those in Anthony. I defer to the trial court's finding that, prior to approaching defendant, the police searched

every other male patron in the bar without seeking their consent. Caltagerone detained and searched Vargas, without obtaining his consent, immediately before directing McDonald to "check out" or, as McDonald put it, "detain" defendant. McDonald "asked" rather than "told" defendant to stand so he could be searched, but this courtesy did little to lessen the pressure on defendant. Although defendant might have believed he had the option to refuse, it is equally likely that he considered himself the inevitable next subject of the officers' general sweep of the bar and therefore resigned himself to the search. The trial court was correct that the State did not bear its burden of proving that defendant's consent was voluntary.

The State's other contention is that the protective frisk of defendant was warranted by the anonymous tip that three or four males with shaved heads and armed with handguns had entered the bar. According to McDonald, the males were "possibly Mexican." The trial court found that defendant did not fall within the scope of the tip because he is not Hispanic and at the time of the search his head was not shaved. I need not decide whether defendant fell within the tipster's description because I find that the tip lacked the requisite reliability in any case.

An officer may briefly stop an individual for investigative purposes if the officer reasonably believes, based on specific and articulable facts, that the individual has committed, or is about to commit, a crime. See generally Terry, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. The officer may also conduct a protective search or frisk of the individual if the officer reasonably believes that the individual may be armed. Terry, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883.

Here, the information that prompted the police to enter the El Navegante bar and frisk the male patrons came from an anonymous source. In Florida v. J.L., 529 U.S. 266, 270, 146 L. Ed. 2d

254, 260, 120 S. Ct. 1375, 1378 (2000), the United State Supreme Court explained how courts are to assess the adequacy of anonymous tips:

> "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, [citation],' an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity,' [citation]. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' [Citation.]"

"Where the reliability of the information obtained from an anonymous informant cannot be easily corroborated and no other suspicious circumstances are known to the police, a stop may be found unwarranted." People v. Ledesma, 206 Ill. 2d 571, 583-84 (2003). "However, substantial corroboration not only establishes an informant's veracity, but also supports an inference that an informant obtained his story reliably." Ledesma, 206 Ill. 2d at 584.

The only authority cited by the State in support of the frisk of defendant is People v. Smithers, 83 Ill. 2d 430 (1980). In Smithers, the police responded to an anonymous tip that there was a " 'man with a gun' " at a certain tavern. Smithers, 83 Ill. 2d at 432. When the police arrived, they heard inside the tavern yelling that suggested some kind of disturbance. They entered the tavern and saw the defendant walking toward them. Upon seeing the police, the defendant reversed course and walked toward the back of the bar. At that point, the police were informed, by either a bartender or one of the patrons, that the defendant was involved in the disturbance. Consequently, the officers stopped the defendant, frisked him, and discovered a gun on his person. Smithers, 83 Ill. 2d at 432-33.

Our supreme court upheld the frisk, based on (1) the seriousness of the tip (i.e., armed man), which "cast[] a heavy weight in favor of the reasonableness of the search" (Smithers, 83 Ill. 2d at 438); (2) the lateness of the hour (4 a.m.) and the statistic that most assaults against police officers occur between 12 a.m. and 6 a.m.; (3) "the circumstances existing at the tavern when the officers arrived," which "confirmed, partially at least, the validity of the call"( Smithers, 83 Ill. 2d at 439); (4) the identification of the defendant as being involved in the disturbance, which gave the police "reasonable grounds to believe the defendant to be the person about whom the 'armed man' call was made" (Smithers, 83 Ill. 2d at 439); and (5) the defendant's evasive behavior upon seeing the police.

In Smithers, the anonymous tip that an armed man was at the tavern was corroborated by the fact of a disturbance at the premises consistent with the presence of an individual with a gun.  Further, someone at the tavern identified the defendant as being connected with the disturbance.  Here, the anonymous tip that several males with shaved heads and armed with handguns entered the El Navegante bar was corroborated insofar as there were males with shaved heads (or at least closely-cropped hair) in the bar when the police arrived.  However, the police observed nothing in the bar corroborating the tipster's claim that there were armed males on the premises.

I believe, therefore, that this case more resembles J.L. than Smithers.  In J.L., the police received an anonymous call that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  J.L., 529 U.S. at 268, 146 L. Ed. 2d at 259, 120 S. Ct. at 1377. On arriving at the bus stop, the police observed three black males, one of whom, the defendant, was wearing a plaid shirt.  The officers did not see a firearm on any of the men and did not observe them make any threatening movements.  That is, apart from the tip, the officers had no reason to suspect any of the three men of illegal conduct or of being armed.  Nonetheless, one of the officers frisked

the defendant and seized a gun from his pocket. The Supreme Court held that the tip was inadequate to justify the frisk. The Court reasoned that the tip lacked "predictive information and therefore left the police without means to test the informant's knowledge or credibility." J.L., 529 U.S. at 271, 146 L. Ed. 2d at 260, 120 S. Ct. at 1379. The Court observed that "[a]ll the police had to go on *** was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]." J.L., 529 U.S. at 271, 146 L. Ed. 2d at 260-61, 120 S. Ct. at 1379. The fact that the tip gave an accurate physical description of the defendant was not enough to save it:

"An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." J.L. 529 U.S. at 272, 146 L. Ed. 2d at 261, 120 S. Ct. at 1379.

The tip in the present case described the subjects in terms of gender and hairstyle (and perhaps race) and also identified their location. However, the tip left the police no means by which they could test the further assertion that the subjects were armed. While the tip was "reliable *** in its tendency to identify a determinate person," it was not "reliable in its assertion of illegality" (J.L., 529 U.S. at 272, 147 L. Ed. 2d at 261, 120 S. Ct. at 1379). Therefore, under J.L., the tip lacked adequate corroboration.

I recognize that Smithers considered factors in addition to corroboration, such as the facts that the subject of the tip was a gunman, which presented a potentially grave situation, and that the

police entered the tavern at an hour that was statistically dangerous for police. Here the police entered the bar shortly after 10 p.m., not during the hours that the Smithers court cited as particularly perilous for police officers. Though I make no suggestion that police ought to conduct themselves differently when responding to a tip at 10 p.m. as opposed to 4 a.m., considerations of police prudence cannot compensate for the tip's failings in other respects. As for the fact that the subjects of the tip supposedly had firearms, this, too, is inadequate to save the tip. In J.L., the Supreme Court refused to establish "an automatic firearm exception to *** established reliability analysis," and noted that Terry's recognition of a less taxing standard than probable cause for protective searches was itself a response to "the serious threat that armed criminals pose to public safety." J.L., 529 U.S. at 272, 147 L. Ed. 2d at 261, 120 S. Ct. at 1379.

I note that, though the Court in J.L. refused to recognize a firearm exception to its reliability requirements, the Court provided no guidance for police on how to respond to an anonymous tip of the kind in J.L. and the present case, i.e., a tip that alleges that a subject is armed yet does not provide enough detail to meet the Terry threshold. Such tips raise the specter of the senseless gun violence whose bloody and tragic consequences are known by our courts but are known with much greater and graver immediacy by the officers who keep the peace on our streets. After J.L., police are in a dilemma: An anonymous tip that a certain individual is armed is too serious to ignore but is insufficient by itself to justify a frisk. What will the officer do? Approach and question the subject, risking the violence that an immediate frisk might avert? Ignore the tip instead? I doubt that our citizenry would wish the latter course. However, "[f]ourth amendment jurisprudence has long justified the exclusionary rule on the supposition that the prospect of illegally seized evidence becoming a legal nullity in court will deter police from effecting illegal seizures." People v.

<u>Luedemann</u>, 357 Ill. App. 3d 411, 432 (2005) (O'Malley, P.J., dissenting). The deterrence meant to flow from <u>J.L.</u> may take two different forms: the police may engage the subject without an immediate frisk (whatever the consequences) or not engage him at all. These courses are equally respectful of the fourth amendment but neither is desirable from the standpoint of citizen and officer safety.

For the foregoing reasons, I would affirm the trial court's decision granting defendant's motion to quash and suppress.