**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230331-U

Order filed July 25, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0331 Circuit No. 21-CF-294 |
| MARTEZ L. MOORE, | ) ) ) | Honorable Thomas W. Cunnington, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Peterson and Albrecht concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirm defendant's conviction for aggravated driving under the influence of alcohol with a blood-alcohol concentration of .08 or more where the record is insufficient for this court to address his claim that trial counsel was ineffective for failing to file a motion to suppress the results of a blood-alcohol test. Affirmed.

¶ 2     Defendant, Martez L. Moore, appeals his conviction for aggravated driving under the influence (DUI) of alcohol with a blood-alcohol concentration (BAC) of .08 or more on the basis

that his trial counsel was ineffective for failing to move to suppress the results of defendant's chemical blood test for alcohol. For the following reasons, we affirm.

¶ 3                                                                I. BACKGROUND

¶ 4        On April 23, 2021, defendant was indicted on two counts of aggravated DUI and one count of reckless homicide arising out of a December 30, 2020, fatal car crash on Route 17 in Kankakee County. Specifically, count I charged aggravated DUI in violation of section 11-501(d)(1)(F) of the Illinois Vehicle Code (625 ILCS 5/11-501(d)(1)(F) (West 2020)) in that defendant, while driving with a BAC of .08 or more, was involved in a motor vehicle accident that resulted in the death of another person (Bettye Becker), and such violation was a proximate cause of the death—a Class 2 felony. Count II also charged aggravated DUI in violation of section 11-501(d)(1)(F) of the Vehicle Code (*id.*) in that defendant, while driving under the influence of alcohol, was involved in a motor vehicle accident that resulted in the death of Bettye, and such violation was a proximate cause of the death—a Class 2 felony. Count III charged reckless homicide in violation of section 9-3(a) (720 ILCS 5/9-3(a) of the Criminal Code of 2012 (West 2020)), in that defendant, with a BAC of .08 or more, operated a motor vehicle at a high rate of speed and struck another vehicle occupied by Bettye, thereby causing her death—a Class 3 felony. Defendant's jury trial commenced on April 3, 2023. We recount the evidence in relevant part.

¶ 5        The testimony established that defendant was the driver and sole occupant of a white Nissan Sentra that struck a blue Chrysler Town and Country van driven by Fred Becker. Bettye was a passenger in the van's front seat. The parties stipulated that, if called to testify, the forensic pathologist who performed the autopsy would opine that Bettye died as a result of multiple injuries suffered in the crash.

¶ 6    Fred testified that, on the morning of December 30, 2020, he and Bettye were driving west on Route 17. He drove the van into a turn-around median intersecting the westbound and eastbound lanes of Route 17, where he intended to cross over the two eastbound lanes of Route 17 onto Sand Bar Road. According to Fred, he stopped at the stop sign in the median, observed a white vehicle "quite a distance" from him with its turn signal on, felt it was safe to cross the intersection toward Sand Bar Road, and proceeded to do so. The crash occurred at this point, and Fred recalled wondering what hit them.

¶ 7    Motorist Brian Flonory witnessed the crash. He testified that he was driving in the right eastbound lane of Route 17 at the time. A white car passed him in the left eastbound lane "so fast it was like a blur" and "like a streak going by," and he was startled. Flonory testified that he was traveling at around 50 or 55 miles per hour, and the white car was going "[w]ay" faster. Flonory also acknowledged that, when he was interviewed on the day of the crash, he estimated that the white car was traveling about 70 miles per hour.

¶ 8    Flonory testified that he saw the white car hit a blue van as the van pulled out from a median at the intersection into the left eastbound lane of Route 17. Flonory elaborated, "As the blue van started to cross 17, the white vehicle continued forward at a high rate of speed. I was looking and I was hoping that that blue van would be out of the way by the time the white vehicle arrived at his location, but it didn't happen." Rather, "[t]he white vehicle ran right into the van, spun it around, and it ended up on the other side of Highway 17." Flonory noticed the van at the intersection at about the same time the white car passed him and believed that he was about 90 feet behind the crash at the time of the impact. Flonory did not see the brake lights of the white car illuminate prior to the crash, nor did he see the white car attempt to avoid the van. However, Flonory believed that, once the van pulled out, there was no way the white car could

3

have avoided the crash, subsequently noting the white car's speed. Flonory called 911 and approached the scene.

¶ 9     Illinois State Trooper Kurt Quick was dispatched to the scene at approximately 10:50 a.m. on December 30, 2020. Quick testified that, upon arriving at the scene, the van was in a ditch south of Route 17 with heavy passenger-side damage, and defendant's white Nissan was partially in the ditch off to the right lane of Route 17 with heavy front-end damage. Defendant was trapped in the driver's seat and unconscious, appeared critically injured, and was being treated by paramedics. The driver of the van also appeared critically injured, and the woman in the front passenger-side seat was deceased. Quick then requested that the Illinois State Police reconstruction unit be sent to the scene to investigate the crash.

¶ 10     Quick testified that he recalled talking to defendant, Fred, and a deputy at the scene. He may have talked to Flonory at the scene but did not recall. As for his conversation with Fred, Quick recalled that Fred believed he had enough time to enter the intersection and proceed southbound onto Sand Bar Road. On the day of the crash, Quick issued a traffic ticket to Fred for failing to yield at a stop sign but testified that he did not know the speed at which defendant had been traveling at the time he issued a ticket to Fred.

¶ 11     Quick testified that, at some point, he left the scene and went to St. Mary's Hospital, where defendant was hospitalized. Quick further testified that he spoke to defendant in his hospital bed and read defendant a "warning to motorist." Quick explained, "A warning to motorist is issued to someone we believe is under the influence of alcohol or drug[s] at the time. They have the right to agree to give blood or urine or refuse." Quick testified that defendant agreed to provide a blood sample. Quick was not questioned and did not elaborate on the content of the warning read, and a copy of the warning was not introduced into evidence.

¶ 12    Quick further testified that, when someone agrees to provide a blood sample, he uses an "ISP DUI kit," which "consists of a box containing vials where blood and urine is placed in by a registered nurse" that is initialed by him and the nurse, "placed in as evidence," and taken to an Illinois State Police lab. Quick testified that he observed registered nurse Heather Gill take a blood sample from defendant at approximately 2:50 p.m. on the day of the crash and that the signed and sealed DUI kit with the blood vials were included in the State's exhibits admitted into evidence. Quick testified that he left the hospital and brought the DUI kit, with the blood vials inside, to the Illinois State Police headquarters, where he placed the kit into a secured locker and documented the submission.

¶ 13    Illinois State Trooper Andrew Delaney testified as an expert in traffic crash reconstruction, over defendant's objection. Delaney testified that he arrived at the scene of the crash at approximately 12:31 p.m. on the day of the crash. Delaney testified that both the Nissan and van were equipped with an air bag control module, or "black box," that generated a crash data report with five seconds of pre-crash data, including, *inter alia*, vehicle speed, braking, steering, and acceleration. With respect to defendant's Nissan, Delaney testified that the module revealed that, from five seconds before the air bag deployed to one second before it deployed, the Nissan was traveling between 95 and 96 miles per hour. Then, from one second before the air bag deployed to one-half second before it deployed, the Nissan was traveling 88 miles per hour. At "zero seconds" before the air bag deployed to the time it deployed, the Nissan was traveling 87 miles per hour. The module also revealed that the Nissan was maintaining its lane of travel and did not swerve during the time period from five seconds to one second before the air bag deployed, and the brake on the Nissan was not activated during this time period. However, the

5

last two data points indicated that defendant was braking up to one second prior to air bag deployment.

¶ 14      With respect to the van, Delaney testified that the data report reflected that the driver of the van made a left turn into the center median and did not make a complete stop at the posted stop sign before entering the left eastbound lane of Route 17. The van's brakes were activated, but the van's driver merely made a rolling stop. The van was traveling 20 miles per hour five seconds before air bag deployment, 18 miles per hour four and one-half seconds before deployment, and 15 miles per hour three and three-tenths seconds before deployment. Delaney further testified that the van was traveling 14 miles per hour both two and three-tenths of a second and two seconds prior to air bag deployment, after which the van sped up with the driver's foot jamming the gas pedal to the floor at one and four-tenths seconds prior to impact. According to Delaney, that "indicate[d] that's his reaction to perceiving an approaching hazard, is he accelerates at a hundred—it says a hundred percent acceleration."

¶ 15      Delaney opined that the actions of both drivers caused the crash. Namely, Fred "disobeyed the stop sign, didn't make a complete stop at the stop sign, entered the left eastbound lane. But, [defendant] was traveling well in excess of the posted speed limit and contributed to the crash also. So it's the actions of both drivers in this case." When asked whether he believed anything other than speeding "contributed to [defendant's] contribution to the crash," Delaney testified that defendant "also consumed alcohol prior to the crash." Delaney further testified that, if Fred had remained stopped at the stop sign, the crash would not have occurred, nor would the crash have occurred if defendant was not driving 96 miles per hour in a 55-mile-per-hour zone.

¶ 16      Alyssa Bufford, a special agent with the Illinois State Police, testified that she and another officer spoke with defendant five days after the crash, on January 4, 2021, at Loyola

Medical Center, where defendant remained hospitalized. She read defendant his *Miranda* warnings, and defendant signed a *Miranda* waiver form. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Bufford asked defendant to provide a summary of the day of the crash. Defendant responded that, in the morning, he left his girlfriend's home in Grant Park and drove to Hopkins Park. There, at approximately 9 a.m., he consumed "three tall beers." After leaving Hopkins Park, he drove to a tire shop in Kankakee and waited while his tire was repaired. At that point, he was in a hurry to pick up his daughter, and "while traveling on Route 17 heading eastbound, a vehicle pulled out in front of him and he collided with that vehicle." Bufford asked if he felt buzzed or intoxicated, and defendant's response was "something to the effect of I drink so it felt normal to me at the time." Defendant stated that he did not know how fast he had been driving, believed he was in the right lane, and could not remember if he applied the brakes but thought he had swerved to try to avoid the crash.

¶ 17        Christine Cava, a forensic scientist specializing in toxicology with the Illinois State Police, testified that she retrieved the sealed DUI kit and tested a sample of defendant's blood on February 26, 2021. Her findings were that "there was .171 grams per deciliter of ethanol and no drugs were detected." Cava testified that, in other words, defendant's BAC was .171. On cross-examination, defense counsel questioned Cava as to her knowledge of whether a preservative was used in the blood sample. Cava responded that, while "[t]he coloring and condition indicates that a preservative and anticoagulant is present" in the blood tube, she was not aware of how much of the preservative was in the tube. At the close of evidence, defendant moved for a directed finding, arguing that defendant's blood sample was not properly preserved because the State's forensic scientist was unable to testify as to the preservative that was used to ensure that the blood did not produce alcohol as it deteriorated. The trial court denied the motion.

¶ 18     On April 6, 2023, the jury returned a verdict of guilty on all three counts—aggravated driving under the influence of alcohol with a BAC of .08 or more, aggravated driving under the influence of alcohol, and reckless homicide. Following a sentencing hearing, on May 26, 2023, defendant was sentenced to four years' imprisonment and one year of mandatory supervised release on count I—aggravated driving under the influence of alcohol with a BAC of .08 or more, and counts II and III for aggravated driving under the influence of alcohol and reckless homicide merged into count I. Defendant filed a motion to reconsider the sentence, which the trial court denied on July 19, 2023. Defendant timely appealed, arguing that trial counsel provided ineffective assistance by failing to move the suppress the blood-alcohol test results.

¶ 19                                   II. ANALYSIS

¶ 20     Ineffective assistance of counsel claims are evaluated under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant in that there is a reasonable probability that the result of the proceeding would have been different. *People v. Jackson*, 2020 IL 124112, ¶ 90. Trial counsel's decision whether to file a motion to suppress is generally considered a matter of trial strategy entitled to great deference. *People v. Bew*, 228 Ill. 2d 122, 128 (2008). In resolving whether there was prejudice based on the failure to file a suppression motion, the defendant "must demonstrate that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Webb*, 2023 IL 128957, ¶ 23 (citing *People v. Henderson*, 2013 IL 114040, ¶ 15). We review an ineffective assistance of counsel claim *de novo*. *Id.*

8

¶ 21    Defendant argues that a motion to suppress the blood-alcohol test results on grounds that the warrantless blood search violated his fourth amendment rights would have been meritorious and that the trial outcome would have been different had the evidence been suppressed. The fourth amendment of the United States Constitution and article I, section 6 of the Illinois Constitution of 1970 protect the right of individuals to be free from unreasonable searches. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A blood test to determine a person's BAC is a search within the meaning of the fourth amendment. *People v. Harris*, 2015 IL App (4th) 140696, ¶ 45 (citing *Missouri v. McNeely*, 569 U.S. 141, 148 (2013)). To be reasonable, a search must generally be conducted pursuant to a warrant supported by probable cause. *People v. Anthony*, 198 Ill. 2d 194, 201-02 (2001). A warrantless search is reasonable only if it falls within a recognized exception. *Harris*, 2015 IL App (4th) 140696, ¶ 45. Exceptions to the warrant requirement include, *inter alia*, consent and exigent circumstances. *Id.*

¶ 22    Defendant frames his argument around the implied consent provisions set forth in the Vehicle Code. See 625 ILCS 5/11-501.1(a) (West 2020) (drivers on Illinois roads "shall be deemed to have given consent" to chemical testing of their blood to determine drug or alcohol content if arrested for DUI, as evidenced by the issuance of a Uniform Traffic Ticket); 625 ILCS 5/11-501.6(a) (West 2020) (drivers on Illinois roads, when involved in a crash where there was a type A injury or fatality "shall be deemed to have given consent" to chemical testing of their blood to determine drug or alcohol content if arrested for any non-equipment violation of the Vehicle Code, as evidenced by the issuance of a Uniform Traffic Ticket). See *People v. Schantz*, 2022 IL App (5th) 200045, ¶ 40 (discussing Illinois's implied consent laws). Defendant argues that he was not under arrest at the time Quick requested the blood sample; thus, these statutory provisions provide no basis for implied consent to the blood test. See *People v. Hayes*, 2018 IL

9

App (5th) 140223, ¶ 57 (implied consent to a blood test requires an arrest for a violation of the Vehicle Code; "that the defendant's movement is restricted to the degree necessary to be seized within the meaning of the fourth amendment coupled with a decision to issue tickets one to two days after the fact, as occurred in this case, is not sufficient to meet this standard.").

¶ 23   In this regard, defendant further argues that a third provision of the Vehicle Code—section 11-501.2—does not provide a basis for admission of his blood-alcohol test results. 625 ILCS 5/11-501.2 (West 2020). Subsection (c)(1) of this provision states that, if a person "under arrest" refuses to submit to testing under the provisions of section 11-501.1, evidence of such refusal shall be admissible in any civil or criminal action or proceeding arising out of acts alleged to have been committed while the person under the influence of alcohol was driving or in actual physical control of a motor vehicle. *Id.* § 11-501.2(c)(1). Subsection (c)(2) continues:

> "Notwithstanding any ability to refuse under this Code to submit to these tests or any ability to revoke the implied consent to these tests, if a law enforcement officer *has probable cause* to believe that a motor vehicle driven by or in actual physical control of a person under the influence of alcohol *** has caused the death or personal injury to another, the law enforcement officer shall request, and that person shall submit, upon the request of a law enforcement officer, to a chemical test or tests of his or her blood, breath, other bodily substance, or urine for the purpose of determining the alcohol content thereof or the presence of any other drug or combination of both. (Emphasis added.) *Id.* § 11-501.2(c)(2).

¶ 24   Defendant observes that subsection (c)(2) does not apply because, again, he was not placed under arrest prior to Quick's request for the blood sample, and, at the time of the request, Quick lacked probable cause to believe that defendant was driving under the influence or that

10

defendant caused the crash. Defendant cites Quick's testimony that, upon arrival at the scene of the crash, defendant was unconscious and being treated by paramedics and that Quick was unaware of the speed defendant had been driving at the time of the crash. Thus, defendant argues that there was no evidence as to any indicia of intoxication at the time to support the existence of probable cause. See, *e.g.*, *People v. Motzko*, 2017 IL App (3d) 160154, ¶¶ 22-23 (evidence that the defendant had a slight odor of alcohol on his breath, had glassy and bloodshot eyes, and admitted to having one drink were insufficient to establish probable cause for a DUI without evidence of other factors to support impairment, such as poor driving, stumbling, falling, or an inability to communicate). Moreover, defendant argues that, even if there had been probable cause, application of section 11-501.2(c)(2) to the facts of this case would be unconstitutional given the absence of any exigent circumstances in the record. See *People v. Eubanks*, 2019 IL 123525, ¶¶ 41, 68-69 (the natural dissipation of alcohol in the bloodstream is not a *per* se exigency that allows warrantless blood tests in DUI cases) (citing *McNeely*, 569 U.S. at 149-52, 165).

¶ 25        The State does not address the merits of defendant's implied consent argument. Instead, the State contends that the statutory implied consent regime is irrelevant because defendant gave *actual* consent to the blood testing and thus, a motion to suppress the blood test would not have been meritorious. Citing *People v. Patel*, 2020 IL App (2d) 190532, the State argues that defendant's actual consent provided an independent basis for the blood testing. The issue in *Patel* was whether the defendant's chemical test results were admissible in his criminal aggravated DUI trial where he was not under arrest at the time he consented to the testing. *Id.* ¶ 20. In reversing the trial court's ultimate grant of the defendant's motion *in limine* to bar the test results, the appellate court rejected the defendant's argument that he had to be under arrest, as

11

required by the implied consent statutory provisions, in order for consented-to blood and urine samples to be admissible in his criminal trial. *Id.* ¶¶ 23-24. The court reasoned that, while the State cannot rely on *implied* consent for admissibility unless the defendant had been under arrest for a violation of the Vehicle Code, the lack of an arrest does not preclude reliance upon *actual* consent for admission. *Id.* ¶ 23-24, 29-35 (citing *People v. Wozniak*, 199 Ill. App. 3d 1088, 1091 (1990) (the predicate-arrest provision of the summary-suspension statute did not extend to a DUI prosecution)); see also *Hayes*, 2018 IL App (5th) 140223, ¶ 58 ("[O]ur holding does not limit the admissibility of test results in cases where the defendant has actually given voluntary consent or in cases where some other recognized exception to the requirement of a warrant applies."). Accordingly, here, the State argues that, like *Patel*, the only issue is *actual* consent. The State maintains that Quick testified, in no uncertain terms, that defendant agreed to the blood draw upon Quick's request. Thus, according to the State, defendant's actual consent renders immaterial any discussion regarding implied consent, the need for a warrant, probable cause, or exigent circumstances.

¶ 26        However, defendant responds that any consent to the blood test was not voluntary under the circumstances of this case—an issue not explicitly raised in *Patel*. See *Patel*, 2020 IL App (2d) 190532, ¶ 35 ("Defendant, however, does not challenge the admission of the chemical tests on the basis that his actual consent was otherwise invalid."). While "[a] search conducted with a defendant's voluntary consent but without a warrant does not violate the fourth amendment," the validity of the search depends upon the voluntariness of the consent. *Anthony*, 198 Ill. 2d at 202. Whether consent is voluntary is a question of fact to be determined from the totality of the circumstances, and the State bears the burden of proving the voluntariness. *Id.* In examining the surrounding circumstances to determine if the consent was coerced, " 'account must be taken of

12

subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.' " *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973)).

¶ 27　　　　Defendant argues that he could not have voluntarily consented to providing his blood for testing because Quick misled him as to the consequences of refusing to consent by reading him the inapplicable "warning to motorist." According to defendant, he merely acquiesced, while purportedly lying unmedicated in a hospital bed with two broken legs and a broken hip, to Quick's false assertion of lawful authority to collect the blood sample. See *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (the prosecution's burden to prove voluntariness of consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); *Anthony*, 198 Ill. 2d at 203-04 (the State failed to establish that the defendant's " 'assuming the position' " of an arrestee in response to the officer's request for consent to search the defendant's person amounted to voluntary consent, and not just acquiescence to the presence of "an armed and uniformed police officer who had just asked a series of subtly and increasingly accusatory questions").

¶ 28　　　　Pursuant to the implied consent statutory provisions discussed *supra*, a law enforcement officer who requests submission to chemical testing is required to warn the motorist, *inter alia*, of the consequences of refusing the testing. See 625 ILCS 5/11-501.1(c); 11-501.6(c) (West 2020); *Schantz*, 2022 IL App (5th) 200045, ¶ 40. As discussed, though Quick testified that he read a "warning to motorist" to defendant before seeking the blood sample, he did not elaborate as to the content of what was read, merely explaining, "A warning to motorist is issued to someone we believe is under the influence of alcohol or drug[s] at the time. They have the right to agree to give blood or urine or refuse." A copy of the warning was not introduced into evidence. Defendant cites the form warning on the Illinois State Police's website (see

13

https://isp.illinois.gov/StaticFiles/docs/TrafficResources/8%20Hour%20BAO%20Class%20Man ual.pdf (last accessed June 28, 2024)), and requests that we take judicial notice of the form. See Ill. R. Evid. 201(b)(2) (eff. Jan. 1. 2011) ("Judicial Notice of Adjudicative Facts"). The State responds that, while it "acknowledges the apparent authentic nature of the warning on the link defendant provides, it still cannot be concluded with certainty that warning was the one Quick gave to defendant on December 30, 2020."

¶ 29     There are two form warnings on the website—the "Warning to Motorist" form and the "Traffic Crash Warning to Motorist" form. The first form—the "Warning to Motorist" form— begins, "Subsequent to an arrest for driving while under the influence of alcohol ***, you are hereby notified," and proceeds to advise, *inter alia*, as to the minimum length of time that the motorist's driving privileges will be suspended (12 months or 3 years depending on whether the motorist is a first offender) "[i]f you refuse or fail to complete all chemical tests requested" and the *shorter* minimum length of time that the motorist's driving privileges will be suspended (6 months or 1 year depending on whether the motorist if a first offender) "[i]f you submit to a chemical test(s) disclosing an alcohol concentration of .08 or more." The form adds that, if the motorist was involved in an accident that caused personal injury or death to another in addition to the DUI arrest, the motorist's driving privileges will be revoked for a minimum of 12 months. The second form—the "Traffic Crash Warning to Motorist" form—begins, "Subsequent to your involvement in a crash involving a Type A injury *** or fatality" as evidenced by, *inter alia*, the issuance of a Uniform Traffic Ticket for any nonequipment violation of the Vehicle Code, "you are hereby notified and warned," and proceeds to advise as to the same lengths of time (as set forth in the "Warning to Motorist" form) that the motorist's driving privileges will be suspended

14

upon refusal of, or submission to (with disclosure of an alcohol concentration of .08 or more), the testing.

¶ 30    Notwithstanding Quick's testimony suggesting he read defendant the DUI "Warning to Motorist," defendant appears to maintain that Quick read him the "Traffic Crash Warning to Motorist." Specifically, defendant asserts that Quick "explicitly warned" defendant that "he had impliedly consented to a chemical test of his blood by virtue of being involved in a fatal [motor vehicle accident]." Defendant further asserts that Quick misrepresented that defendant had already been issued a Uniform Traffic Citation and that, by consenting to blood testing, defendant could reduce the amount of time his license would be suspended as a result of his involvement in the fatal crash. Defendant's assertions, however, are not substantiated by the record as currently developed, and the content of the warning Quick read to defendant is at best uncertain.

¶ 31    Defendant maintains that being inaccurately told that he had been issued a traffic ticket or was under arrest for DUI and that refusing a chemical test would subject him to statutory summary suspension automatically vitiated his consent. However, in addition to the lack of certitude in the record regarding the content of the warning read and what precisely defendant was told, there was no testimony about how defendant specifically responded to the request for a blood draw. Quick merely testified that defendant consented. There was no elaboration on the point and no challenge to the testimony. There was no specificity regarding the precise timing of the request, how the request was presented to defendant, or how defendant responded. Nothing in the record evidences whether defendant immediately agreed to give the sample, asked questions, objected, or, as he now asserts, merely acquiesced to Quick's assertion of authority to collect the blood sample. We do not know if defendant was cooperative or uncooperative. We do not know

15

the particularities of defendant's physical condition at the time. The voluntariness of defendant's consent was not an issue at trial, and the circumstances surrounding defendant's consent were never developed.

¶ 32    Defendant maintains that the lack of evidence in this regard should equate to a holding that the State failed to meet its burden of demonstrating that his consent was voluntary. The State counters that the insufficient record precludes proper review of whether defendant voluntarily consented to the blood testing and that defendant's ineffective assistance of counsel claim is better suited to collateral proceedings. Under the particular circumstances of this case, we agree. While the State bears the burden of proving the voluntariness of consent (*Anthony*, 198 Ill. 2d at 202), defendant bears the ultimate burden of proof on a motion to suppress evidence (*People v. Brooks*, 2017 IL 121413, ¶ 22). But here, a motion to suppress was never filed, and defendant's claim is that this failure amounted to ineffective assistance of counsel. As discussed, when an ineffectiveness claim is based on counsel's failure to file a suppression motion, the defendant must demonstrate that the unargued suppression motion is meritorious and that there is a reasonable probability that the trial outcome would have been different had the evidence been suppressed. *Webb*, 2023 IL 128957, ¶ 23.

¶ 33    Where the trial record is incomplete or inadequate for a reviewing court to resolve an ineffective assistance of counsel claim, courts have held that the issue is better suited for a collateral proceeding, particularly when the record is undeveloped because the source of counsel's alleged deficiency was not litigated in the trial court. See, *e.g.*, *Bew*, 228 Ill. 2d at 133-35 (the record was insufficient to address the defendant's claim that trial counsel was ineffective for failing to file a motion to suppress based on a theory not raised in the trial court); *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 16 ("For defendant to meet his burden of showing that his

trial counsel was deficient for the purpose of obtaining relief on an ineffective assistance of counsel claim [for failing to file a "motion to quash arrest"], defendant must establish a factual basis for his claim. He cannot do so on direct review in this case. Because the record is insufficient, we must affirm."). In considering whether the instant record is sufficiently developed to adequately address defendant's ineffective assistance claim, we are mindful that, in *People v. Veach*, 2017 IL 120649, ¶ 46-48, our supreme court cautioned against categorically determining that all ineffective assistance of counsel claims are better suited for collateral review. The court instructed that we must "carefully consider each ineffective assistance of counsel claim on a case-by-case" basis to determine if the circumstances permit this court to adequately address the claim on direct review before deferring consideration of the claim to collateral review. *Id.* ¶¶ 47-48.

¶ 34    Here, after carefully reviewing defendant's ineffective assistance of counsel claim and the record on appeal, we hold that defendant's claim is better suited to a collateral proceeding where any supporting facts can be developed. For the reasons discussed *supra*, the record does not contain sufficient evidence to enable a meaningful review of whether a motion to suppress the blood test would have been meritorious. Accordingly, we affirm defendant's conviction for aggravated driving under the influence of alcohol with a BAC of .08 or more.

¶ 35                                III. CONCLUSION

¶ 36    For the reasons stated, we affirm the judgment of the circuit court of Kankakee County.

¶ 37    Affirmed.